**Brandon A. JONES a/k/a Wilbur May, Petitioner,**

v.

**Ralph KEMP, Warden Georgia Diagnostic and Classification Center, Respondent.**

No. 1:88–cv–328–CAM.

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 16, 1989.

Richard Kopelman, Fain Major & Wiley, Edgar A. Neely, Jr., Tami Lewis Brown, Neely & Player, Atlanta, Ga., for petitioner.

Susan Virginia Boleyn, William Bradley Hill, Jr., Office of State Atty. Gen., Atlanta, Ga., for respondent.

## OPINION AND ORDER OF COURT

MOYE, Senior District Judge.

Brandon A. Jones, a/k/a Wilbur May, petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth in Parts III, A–H, of this opinion, the court finds petitioner's claims of alleged error during the guilt/innocence phase of his trial to be without merit. For the reasons set forth in Part IV of this opinion, however, the court finds that the state trial court committed constitutional error in the sentencing phase of the petitioner's trial. Accordingly, the court grants the petitioner's application for a writ of habeas corpus unless the petitioner shall have been resentenced within 120 days of the date of this order.

### I. Procedural History

During the July, 1979 term of the Superior Court of Cobb County, the petitioner, Brandon Astor Jones, a/k/a Wilbur May, was indicted, along with co-defendant Van Roosevelt Solomon, for the murder of Roger Dennis Tackett. In the early morning of June 17, 1979, Mr. Tackett had been murdered at his place of employment, a self-service Tenneco gas station on Delk Road in Cobb County.

Petitioner was tried by a jury in the Superior Court of Cobb County on October 8–11, 1979. He was convicted of murder, and sentenced to death by electrocution. The jury found as aggravating circumstances that (1) the offense of murder was committed while petitioner was engaged in the commission of an armed robbery (O.C.G.A. § 17–10–30(b)(2), formerly Georgia Code Ann. § 27–2534.1(b)(2)), and, (2) the offense of murder was outrageously and wantonly vile, horrible and inhuman, in that it involved torture, depravity of mind and an aggravated battery to the victim (O.C.G.A. § 17–10–30(b)(7), formerly Georgia Code Ann. § 27–2534.1(b)(7)).

Petitioner appealed his conviction and sentence to the Supreme Court of Georgia. The Supreme Court of Georgia affirmed both on June 30, 1982. *Jones v. State*, 249 Ga. 605, 293 S.E.2d 708 (1982).

On December 30, 1982, petitioner, pursuant to O.C.G.A. § 9–11–41, *et seq.*, filed a petition for writ of habeas corpus in the Superior Court of Butts County. Petitioner amended his petition on February 15, 1983 and May 9, 1983. After holding evidentiary hearings on February 15, 1983 and May 9, 1983, the Superior Court of Butts County denied petitioner all relief on June 20, 1983.

On July 16, 1983, petitioner filed a notice of appeal of the denial of his petition for writ of habeas corpus, and on July 19, 1983, he filed an application for a certificate of probable cause to appeal. On September 28, 1983, the Supreme Court of Georgia affirmed the lower court's denial of the petition for writ of habeas corpus. *Jones v. Francis*, 252 Ga. 60, 312 S.E.2d 300 (1984), *cert. denied*, 469 U.S. 873, 105 S.Ct. 228, 83 L.Ed.2d 157 (1984).

On May 30, 1984, petitioner filed a petition for writ of certiorari in the United States Supreme Court. On October 1, 1984, the Supreme Court denied review. A timely petition for rehearing was filed on

October 24, 1984 and was denied. *Jones v. Francis,* 469 U.S. 1067, 105 S.Ct. 552, 83 L.Ed.2d 439 (1984).

On September 29, 1986, petitioner filed a petition for writ of habeas corpus in this court. On November 10, 1986, this court dismissed the petition without prejudice for failure to exhaust state remedies and remanded to the state court for further proceedings.

The petitioner filed a second petition for writ of habeas corpus in the Superior Court of Butts County, Georgia on December 9, 1986. On March 10, 1987, the Superior Court of Butts County dismissed the petitioner's second state habeas corpus petition as successive under O.C.G.A. § 9–14–51, finding the claims to involve procedural defaults with no showing of cause or prejudice. On June 15, 1987, the petitioner filed a notice of appeal and an application for a certificate of probable cause to appeal. On September 25, 1987, the Supreme Court of Georgia denied the petitioner's application for a certificate of probable cause to appeal.

The petitioner filed the instant petition on February 19, 1988, alleging twenty-four separate grounds for relief. The respondent filed an answer to the petition on April 19, 1988 and an extensive brief in support of the answer on June 21, 1988. Since June 21, 1988, the petitioner has filed five briefs in support of his petition for habeas corpus, the last of which was filed on August 19, 1988.

## II. Summary of the Trial Evidence: Guilt/Innocence Phase

The evidence presented at trial indicates that at approximately 11:20 p.m. on June 16, 1979, Roger Tackett, the manager of a Tenneco service station on Delk Road in Cobb County, Georgia arrived at his place of employment to assist his employees in closing the station for the evening. His employees left shortly after he arrived, and Mr. Tackett stayed to do some paperwork.

At approximately 1:50 a.m. on June 17th, Officer Roy Thomas Kindel, a patrolman with the Cobb County Police Department, drove a woman, who had been stranded by her date, to the Tenneco station to make a phone call from the phone booth located in the station's parking lot. Officer Kindel observed that a car was parked in front of the Tenneco station. The driver's door of the car was open. Suspicious as to why a car with its door open would be parked in front of the station at a time when the station was obviously closed, Officer Kindel decided to investigate.

The lights in the store were on and it was, of course, dark outside. As Officer Kindel approached the store, he saw the petitioner poke his head out from the storeroom at the back of the store, take a quick glance around, and quickly shut the storeroom door. The officer testified that he did not think that the petitioner saw him. Not sure what was happening inside the store, Officer Kindel drew his weapon and entered the store, the front doors of which were unlocked.

Just after he entered the store, Officer Kindel heard four shots from the back storeroom—three successive blasts, a pause, and then a fourth shot. He took a few minutes to gain his composure (he had "almost hit the ceiling" after hearing the shots) (T. 443),[1] and then yelled: "Police, come on out from back there." *Id.* No one responded to his call. Officer Kindel walked toward the back room, opened the door, and found the petitioner and Van Solomon. Officer Kindel instructed the petitioner and his co-defendant to place their hands on top of their heads and walk out of the storeroom. As he backed them out of the storeroom and into the main part of the store, Officer Kindel asked the petitioner and his cohort what they were doing in the storeroom. According to Officer Kindel, Mr. Solomon replied: "Burglarizing." (T. 445).

Officer Kindel instructed the suspects to lie down on the floor of the store. He immediately got on his walkie-talkie to request assistance and then gave the suspects their *Miranda* warnings. Officer

---

1. The four volume transcript of petitioner's trial is Respondent's Exhibit No. 1 in this Court and references to this transcript will be indicated by "T," followed by the appropriate page number.

Kindel handcuffed the petitioner and instructed Mr. Solomon not to move. He searched their pockets and led Mr. Solomon outside and placed him, uncuffed, in the back seat of his police car. Officer Kindel then went back inside to escort petitioner out of the store, at which time a private security consultant, Alex Woolard, arrived on the scene in response to Officer Kindel's call for assistance. Alex Woolard lent Officer Kindel a pair of handcuffs which Officer Kindel promptly placed on Solomon. Meanwhile, the petitioner was placed on the hood of the police car. Woolard agreed to keep an eye on the petitioner while Officer Kindel looked around.

Officer Kindel began to search the premises. He found the in-case-of-emergency code tag located on the front window of the store with the phone number to call in case of trouble. He called the number and was told that someone was supposed to be at the store. (T. 448). He then exited the store, surveyed the area around the store, and discovered a van parked in a wooded thicket about fifteen yards from the store. Officer Kindel and Mr. Woolard began putting two and two together and realized that if the van belonged to the suspects then the car parked in front of the store must belong to someone else, presumably the Tenneco employee who was supposed to still be at the store. Mr. Woolard began to question the petitioner. As Mr. Woolard testified at trial:

I said, 'Why don't you tell me what is going on, the whole storey (sic).' And he said, 'I might get in too much trouble.' And he kept looking up—his face was down, this way, and he would look up through the windshield to the back where the other subject was sitting and then put his head back down again. He did this two or three times. When I asked them (sic) a question—it was approximately 30 minutes after I arrived on the scene—in talking to him, that he decided—he told me, he said, 'Well, I might as well tell you—', he said,—that

there is a man in the back, hurt.' And I said, 'What do you mean "hurt"?' He said, 'He is hurt bad, he is bad hurt,' is what he said. I said, 'Has he been beaten up or what?' He said, 'No. He has been shot.'

(T. 491).

Mr. Woolard yelled to Officer Kindel that there was "a body in the back." (T. 491). Officer Kindel and Mr. Woolard grabbed a crowbar from the trunk of Mr. Woolard's car, entered the store and pried open the storeroom door which had apparently automatically locked upon closing. After breaking the door down, Officer Kindel and Mr. Woolard searched the storeroom and found Roger Tackett in a pool of blood.

Mr. Tackett had been shot five times. The medical examiner who performed the autopsy on Mr. Tackett testified at trial that, in his opinion, the victim was first shot in the hip area (twice) and in the left thumb. The examiner opined that the victim was still alive when he received his fourth wound, a shot to the jaw, as indicated by aspirated blood in the victim's lungs. (T. 682–83). The final shot, in the examiner's opinion, was to the skull just behind the victim's left ear and was most likely made with the muzzle of the gun "just about in contact with the skin." (T. 668).

Near the victim's body, on top of a cardboard box containing a number of plastic garbage bags, the officers found a Smith and Wesson .38 caliber revolver and a Colt snub nose .38 revolver.[2] The Colt revolver had four spent rounds in its chambers; the Smith and Wesson revolver had one spent round.[3] The state's ballistics expert testified at trial that the bullets removed from Roger Tackett's body during autopsy were fired from the two guns found on the premises. (T. 649–661). Police also discovered the cash drawer from the store's register on top of milk crates in the walk-in cooler area of the store, a location different from

2. Holsters fitting these guns were found in the van parked near the store. The van, it was later discovered, belonged to Mr. Solomon.

3. After arresting Solomon and the petitioner, the police performed neutron activation tests on the suspects. The results of these tests indicated that both men had recently fired guns.

the usual spot in which it is placed at night. The cash drawer contained $253.50.

Three other important pieces of evidence were found on the scene. First, a loaf of bread was found on the front seat of Roger Tackett's car. Second, a note from Roger Tackett to the manager who was supposed to open the store the next day was found on the counter. The note stated: "I had to come back and lock up. Neither of the girls have the keys. So, I did some of the paper work. Please unfasten the gas closed sign on the pole. Have a good day. Fifty-seven cents for a loaf of bread. Ring it up." Third, when Roger Tackett was found, his keys and the padlock for the front door of the store were in his possession.

These facts indicate that the petitioner and his codefendant waited for Roger Tackett to exit the store. When Roger Tackett had gotten to his car and had put his loaf of bread on the seat, the petitioner and co-defendant apprehended Mr. Tackett (this would explain why Mr. Tackett's car door was open), forced him to open the door to the store (the padlock and keys were found in Mr. Tackett's possession), made him show them where the cash drawer was hidden, took him into the storeroom, and killed him "in cold blood."

Petitioner testified on his own behalf at trial. He stated that he and Van Roosevelt Solomon had driven to the Tenneco in the early morning hours of June 17, 1979 to meet a person from whom petitioner could buy marijuana. He testified that while they were waiting for their supplier to arrive, the petitioner and Mr. Solomon discussed how easy it would be to burglarize the Tenneco station. Petitioner stated that when it became apparent that his supplier was not going to appear, he and Mr. Solomon went into the store to buy some beer. Petitioner testified that when they found no one in the front of the store, they walked into the back storeroom and discovered Mr. Tackett's body.[4] Petitioner claims

that at that point the two men started to leave the station but panicked when they saw a police car in the parking lot. Petitioner testified that he did not harm the victim or take money from the station's cash drawer. He testified that while he neither fired a gun nor heard any gun shots while at the store, he had fired a gun much earlier in the evening "into the dirt" (T. 706) in Solomon's backyard.

### III. Legal Discussion: Guilt/Innocence Phase

Petitioner raises in his petition eight separate grounds for relief on the basis of events which occurred in the guilt/innocence phase of his trial. The court will examine each of these grounds in detail.

### A. *Ineffective Assistance of Counsel*

As Ground A of his application for federal habeas corpus relief, paragraphs 28 and 29, including subparts, petitioner alleges that his court-appointed attorney failed to render reasonably effective counsel at trial in violation of petitioner's rights under the Sixth, Eighth and Fourteenth Amendments of the United States Constitution, violations which allegedly caused actual and substantial prejudice to petitioner's defense.

The most recent pronouncement of the United States Supreme Court on the issue of ineffective assistance of counsel occurred in *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) where the Court stated:

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, the Court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably effective assistance.

---

4. Petitioner made no attempt to explain how they entered the back room when the evidence shows that the door thereto was locked, was of the type that closed automatically and could be opened only from the inside, had to be pried open by the police, and the keys thereto found on the deceased.

The Eleventh Circuit has also stated that the standard for assessing ineffective assistance of counsel, "demands deference to choices made by the trial attorney." *Mulligan v. Kemp*, 771 F.2d 1436, 1440 (11th Cir.1985), *reh'g and reh'g en banc denied*, 804 F.2d 681 (11th Cir. 1986), *cert. denied*, 480 U.S. 911, 107 S.Ct. 1358, 94 L.Ed.2d 529 (1987). A determination of whether a petitioner received ineffective assistance of counsel is a mixed question of fact and law. *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed. 2d 333 (1980). In resolving a claim of ineffective assistance of counsel, the totality of the circumstances in the entire record must be examined. *Palmes v. Wainwright*, 725 F.2d 1511, 1519 (11th Cir.1984), *reh'g denied*, 729 F.2d 1468 (1984), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984), *citing Goodwin v. Balkcom*, 684 F.2d 794, 804 (11th Cir.1982), *cert. denied*, 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983).

The burden is on the petitioner to establish ineffectiveness by showing that the errors of counsel were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984). Assuming that petitioner can establish ineffectiveness, he must then establish that if it were not for counsel's errors or omissions, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068.

Petitioner's trial attorney was Darrell Green. Mr. Green testified before the State habeas corpus court on the issue of ineffectiveness. At the time of his testimony, he had been practicing law for about 19 years with a trial practice including both civil and criminal cases. (H.T. 23).[5] Mr. Green was appointed to represent the petitioner. *Id.* With regard to his experience in capital felony murder cases, Mr. Green testified, "I think Mr. Jones' case was prob-

ably about the fifth death penalty case and probably the—maybe twelfth or thirteenth murder case [I had tried]." (H.T. 24). Two of the cases in which Mr. Green had represented criminal defendants were cases tried under the 1976 Death Penalty Statute under which the petitioner was also tried. *Id.*

Mr. Green filed a motion to sever petitioner's trial from that of his co-defendant, Van Roosevelt Solomon, and Mr. Solomon was tried prior to the petitioner's trial. As noted by the state habeas corpus court, Mr. Green was appointed to the case on June 20, 1979, three days after the crime and petitioner's arrest. (Respondent's Exhibit No. 17, page 2, citing record on appeal). Petitioner had already been indicted at the time of Mr. Green's appointment; therefore, it was unnecessary for Mr. Green to demand a preliminary hearing. (H.T. 40).

Petitioner's first claim of ineffectiveness, raised in paragraph 29(a) of his application, is that counsel allegedly failed to investigate adequately the case against the petitioner. As the Eleventh Circuit stated in *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir.1985), *cert. denied*, 479 U.S. 918, 107 S.Ct. 324, 93 L.Ed.2d 297 (1986), "Speculation is insufficient to carry the burden of the habeas corpus petitioner as to what evidence could have been revealed by further investigation." Specifically, petitioner cites the fact that his trial counsel sought an investigator only three weeks prior to the time that petitioner's trial began and almost three months after counsel had been appointed.

As noted by the state habeas corpus court, Mr. Green approached the petitioner's case with the understanding that the death penalty was being sought. (Respondent's Exhibit No. 17, page 2, citing H.T. 55). Mr. Green interviewed the petitioner six or seven times prior to trial. (H.T. 38). The first several interviews were in June, shortly after the incident occurred and shortly after Mr. Green's appointment. The remainder of the interviews were

5. References to the transcript of the State habeas corpus hearing held before the State habeas corpus court on February 25, 1983 which consti-

tutes Respondent's Exhibit No. 14 in this court will hereinafter be designated by "H.T.," followed by the appropriate page number.

spread over the period of time leading up to the petitioner's trial. *Id.*

In preparing for the petitioner's trial, Mr. Green personally sat through the entirety of petitioner's co-defendant's trial, which lasted three days. (H.T. 24–25). As the state habeas corpus court found, "counsel did not try to obtain a copy of Solomon's trial because the cases were tried within a week of each other and getting a copy would have delayed Petitioner's trial." (Respondent's Exhibit No. 17, page 3, citing H.T. 33, 64–65). The actual experience of sitting through Solomon's trial was more likely to prepare Mr. Green for petitioner's trial than merely obtaining a transcript would have been, especially since the evidence in Solomon's trial was the same as in petitioner's trial. (Respondent's Exhibit No. 17, page 3). Petitioner does not cite to this court any portion of the Solomon trial which, if appropriately preserved, could have been used for impeachment or like purpose at petitioner's trial. Thus, it is clear that neither paragraph 29(a) nor 29(c) of the petitioner's application provides a basis for finding that counsel was ineffective.

With respect to petitioner's claim that other portions of his trial counsel's pre-trial investigation rendered him ineffective, the court finds, after a review of the record and trial transcript, especially the testimony which Mr. Green gave before the state habeas corpus court, that Mr. Green expended great effort in preparation for petitioner's trial. Mr. Green determined that he would rely on the defense that petitioner was at the scene of the crime in order to obtain some drugs and that the victim was already dead at the time the petitioner entered the convenience store. As Mr. Green stated:

> Petitioner's contention was: that the store was open, the door was open and there was a car parked in the front and the lights were on and there was no one in the store and they began looking for someone and went in the back room and found the fellow who was killed in the back room, dead. And of course his [Petitioner's] defense was that they were

not the ones who committed the crime. They just happened upon it. (H.T. 31).

Mr. Green did in fact hire an investigator, Jerry Switz, to assist him. (H.T. 25). Mr. Green secured the services of Investigator Switz by means of a motion for funds to hire an investigator. Mr. Switz interviewed witnesses and provided Mr. Green with a factual background concerning these witnesses. *Id.* Additionally, Mr. Green filed twelve to fifteen discovery and procedural motions before trial. (H.T. 26). Through these motions Mr. Green obtained copies of petitioner's statement, co-defendant Solomon's statement, the incident report filed by the police officer, and "basically the State's entire file." (H.T. 26). Mr. Green stated that during his discussions with the petitioner, the petitioner was never able to provide him with names of any witnesses who could be called on behalf of the petitioner during the guilt/innocence phase of the trial. (H.T. 27).

In contradiction to the petitioner's claim of prejudice resulting from Mr. Green's delayed motion for an investigator, Mr. Green testified that Mr. Switz did some preliminary work during the time the motion hearings were held, perhaps three to five hours of work, and then, when the court awarded funds, Mr. Switz worked full time, working approximately 30 to 40 hours. (H.T. 42–43). Mr. Green, with the help of Mr. Switz, interviewed the individuals most likely to be witnesses for the State at trial. Green and Switz both interviewed Officer Roy Thomas Kindel. (H.T. 44). Private Investigator Alex Woolard was also interviewed by both Mr. Green and Mr. Switz. (H.T. 43–45). Mr. Green also interviewed Detective Lee Moss, Capt. William P. Jones, Mr. Julian Deal, Detective Robert W. Kelley, the State's expert who performed the gun powder analysis, the State's ballistics expert, and the medical examiner, Dr. Joseph Burton. (H.T. 46–48).

Mr. Green testified that he had in his possession all of the reports that the District Attorney had, including the incident report and the individual reports made by

the investigating officer of the Cobb County Police Department, in addition to the notes from the conversations that Mr. Green and the investigator had with these persons concerning their reports. (H.T. 49). Mr. Green stated that he did not believe that he needed to engage a medical expert to properly cross-examine Dr. Burton and that he did not need to retain a ballistics expert because of his own expertise in that field. (H.T. 54).

Mr. Green stated that he had extensive discussions with the petitioner prior to the time that petitioner took the stand as to what matters petitioner would testify. (H.T. 58). Also, Mr. Green stated that when the jury brought back the guilty verdict, he was prepared to go forward with the penalty phase of the trial. (H.T. 59). As the state habeas court noted:

> Counsel discussed potential character and mitigation witnesses with petitioner. Petitioner was from Illinois and had been passing through Georgia when co-defendant Solomon had picked him up as a hitchhiker. Counsel knew that petitioner grew up in the outskirts of Chicago and was reared by an aunt and uncle. Petitioner never told counsel about his alcohol abuse or being a victim of child abuse. Petitioner specifically told counsel not to contact his wife and family about testifying because petitioner did not want them to find out about the crime. Petitioner did give counsel the name and telephone number of one family member in Chicago. Counsel called the number four or five times and only once reached someone, a young child. Counsel left his number with the child and asked that his call be returned; it was not. Counsel called a couple of times after that but never got anyone.

(Respondent's Exhibit No. 17, page 5, citing H.T. 28–30; 33; 57–58).

■ With respect to the contention raised in paragraph 29(b), that is, that trial counsel failed to offer any evidence in support of the motion for change of venue, Mr. Green testified that he filed a motion for change of venue and that at the motions hearing, the motion was not denied, but the judge simply reserved ruling on the motion until a later time. (H.T. 32). Mr. Green stated that there was not enough evidence to warrant a change of venue as, "there only had been, and as I recall, and I have it in the file, two or three articles in the Marietta newspaper which is basically the Cobb County paper and none of those had been headline stories. They were on the inside of the paper. And we simply reserved—the judge reserved ruling on that motion until the trial after we questioned the prospective jurors on voir dire." (H.T. 32). Additionally, Mr. Green stated that there were very few jurors who knew anything about the case. *Id.* Therefore, Mr. Green stated that there was not sufficient information or evidence to support the motion for change of venue. The court finds that the record supports Mr. Green's position on this question.

■ In paragraphs 28(d), (e), (f), (g), (h), and (i), petitioner alleges that his trial counsel was ineffective for failing to object to certain arguments made by the prosecutor, to certain instructions given by the trial court, and to the admission of certain evidence. Decisions as to what objections to make and when to make them are matters within the trial counsel's discretion, and the strategic choices of counsel do not establish ineffective assistance, even if in hindsight these strategic choices are proven to be erroneous ones. *Sanchez v. United States*, 782 F.2d 928, 935 (11th Cir.1986), *reh'g and reh'g en banc denied*, 788 F.2d 1570 (11th Cir.1986). The court finds no basis to fault counsel's conduct of the trial in the areas pointed out, even in hindsight, certainly nothing overcoming the *Strickland v. Washington* presumptions.

■ In paragraph 28(j), petitioner contends that his trial counsel failed to adequately investigate and locate witnesses and other evidence to present at the sentencing hearing. As discussed above, Mr. Green testified before the state habeas corpus court that petitioner specifically told Mr. Green *not* to contact his wife and family about testifying, and also the one family member whose name and number were given to counsel could not be reached,

even after numerous attempts. (Respondent's Exhibit 17, page 5, citing H.T. 28–30; 33; 57–58). The court notes that counsel is not constitutionally required to present *any* mitigating evidence on behalf of a defendant at the sentencing phase. *See Mitchell v. Kemp*, 762 F.2d 886, 889 (11th Cir.1985), *reh'g and reh'g en banc denied*, 768 F.2d 1353 (11th Cir.1985), *cert. denied*, — U.S. —, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1985), *citing Stanley v. Zant*, 697 F.2d 955, 961–962 (11th Cir.1983), *reh'g denied*, 706 F.2d 318 (11th Cir.1983), *cert. denied*, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984). Mr. Green testified that he and the petitioner had discussed the petitioner's background. (H.T. 57). From these discussions, Mr. Green learned that the petitioner was from Illinois and had been passing through Cobb County. Mr. Green stated, "and the only other people that I was aware of that he knew was the fellow that was his co-defendant and had not known him very long according to what he told me. He had picked him up hitchhiking on I–75. He was coming back from Florida." (H.T. 58). As the petitioner failed to provide Mr. Green with any local character witnesses to testify on petitioner's behalf, as the petitioner himself insisted that his wife and children be kept unaware of the trial, and as the petitioner's brother could not be contacted by phone, the court finds that Mr. Green was not ineffective for failing to call additional witnesses in mitigation at the sentencing phase of petitioner's trial.

In paragraph 28(k), petitioner alleges that his counsel was ineffective for failing to object to the State's use, during the sentencing phase of petitioner's trial, of the statement which petitioner had given to the police which had been ordered suppressed by the court during a pre-trial hearing.[6] Again, what objections to make and when to make them are matters of trial strategy which do not support a finding of ineffectiveness. *See Sanchez v. United States*, 782 F.2d at 935. Furthermore, the court notes that defense counsel *did* object to the prosecution's questions to petitioner regarding statements contained in the post-arrest statement. (T. 838). In fact, petitioner's trial counsel asked for a mistrial based on the prosecution's reference to the suppressed statements. (T. 838–839).

■ In paragraph 28(1), petitioner claims that his attorney was ineffective for failing to make an objection to the trial judge's allegedly falling asleep for short periods of time during critical portions of the petitioner's trial. Mr. Green stated that he did not recall the trial judge ever falling asleep and stated that, "I would be very surprised if that occurred. Usually Judge Hames, who was the trial judge in the case, a former prosecutor for about 25 years, and I don't think he would doze off during a murder case" (H.T. 34). In light of Mr. Green's testimony that he did not recall Judge Hames's falling asleep at all during the trial, Mr. Green's failure to object to an event that he does not recall having occurred certainly does not rise to the level of ineffective assistance of counsel sufficient to amount to constitutional error. Assuming *arguendo* that Judge Hames did fall asleep during trial, Mr. Green's failure to object might very well have been a strategically sound decision designed to avoid an embarrassing and awkward situation. Indeed, an objection in such a case may very well have had a negative effect on the jury. Thus, the court is unprepared to say, on the record before it, that Mr. Green's failure to object to an event he claims did not

---

6. On the evening of his arrest, the petitioner gave to the police a statement which when transcribed amounted to nine pages. This statement, the subject of a pre-trial suppression motion, was ordered suppressed by the trial court. The court did not indicate the precise basis for its ruling and never made a finding as to whether the statement had been voluntarily given to the police.

During the sentencing phase of his trial, petitioner was cross-examined by the prosecutor with regard to remarks contained in the post-arrest statement. (T. 837–838). Specifically, the prosecutor asked the petitioner whether he recalled talking to a Detective Deal and telling him that "you were in there robbing the place." (T. 838). Petitioner alleges that counsel did not object to the prosecutor's questions, and it is this alleged failure to object which petitioner claims amounts to ineffective assistance of counsel. *See* Petition, Paragraph 28(k); Paragraphs 53–55.

happen amounts to ineffective assistance of counsel.

In paragraph 28(m) of his petition, petitioner contends that his counsel failed to object to the fact that petitioner was denied medical care by the State and that such failure to object resulted in petitioner's inability to properly assist his counsel. As Mr. Green testified:

> The only thing that I recall about his medical condition was that, I believe, the day that the trial started, Mr. Jones complained that he was having a medical problem and I relayed that to the judge and the trial was suspended—well, actually we had not started at that point in time. We had been called for trial. And the county physician, Dr. Trion was called and examined Mr. Jones at the time, prior to trial starting.

(H.T. 27–28). Other than this problem prior to trial, Mr. Green stated that he had no recollection of any other medical problem experienced by the petitioner (H.T. 35), and the petitioner has offered this court no evidence of any ailment that might have impaired his ability to assist his counsel. The court finds petitioner's claim in paragraph 28(m) to be without merit.

■■■ In paragraph 28(n), petitioner contends that trial counsel's failure to object to the trial court's allowing a Christian Bible to go out with the jury during the course of the jury's deliberations amounted to ineffective assistance of counsel. Again, counsel's failure to object does not give rise to an ineffective assistance claim.[7] In fact, the client may be better off if no objection is made, which would be a difficult one in any event, for his client may get the benefit of "Christian" charity from a "Christian" Bible, but, if not, he is left with a substantial legal argument. *See infra,* Part IV.[8]

After reviewing the totality of the circumstances surrounding the petitioner's trial, this court is of the opinion that petitioner received at least reasonably effective assistance of qualified, experienced and active trial counsel and the petitioner has failed to meet either prong of the test for reviewing ineffective assistance of counsel claims as set forth in *Strickland v. Washington, supra. See also, Riley v. Wainwright,* 778 F.2d 1544 (11th Cir.1985), *reh'g and reh'g en banc denied,* 782 F.2d 180 (11th Cir.1986), *cert. denied,* 479 U.S. 871, 107 S.Ct. 240, 93 L.Ed.2d 165 (1986).

### B. *Voir Dire Procedures*

In Section B, paragraphs 30–32 of his petition, petitioner contends that the jury selection procedures used by the trial court and the alleged restrictions placed by the trial court on petitioner's counsel during the jury selection process violated the petitioner's right to a fair trial by an impartial jury. First, petitioner contends that the trial court refused to permit individual sequestered voir dire of prospective jurors so as to make it "impossible" for a fair and impartial jury to be selected. (¶ 31). The petitioner claims that as a result of the collective voir dire, prejudicial information was communicated among the prospective jurors during the selection process. Specifically, the petitioner claims that members of the venire were tainted by their peers' opinions regarding (1) the desirability of execution in murder cases, (2) the credibility of official witnesses *vis a vis* lay witnesses, and (3) the possibility of early parole in cases in which a life sentence is given. Petitioner also claims that the facts of this case made it necessary for counsel to have the opportunity to raise sensitive and controversial questions to explore any possible bias or prejudice of each prospective juror. The petitioner argues that the panel might have been contaminated by the

---

**7.** For more extensive discussion of the constitutionality of the trial judge's allowing a bible to go out with the jury, as opposed to petitioner's ineffective assistance with respect thereto, *see infra* Part IV of this Opinion and Order.

**8.** The state does not argue that Mr. Green's failure to object to the juror's request for the

Bible was a deliberate attempt to build error into the trial. In fact, the record indicates that the opposite is true. When questioned at the state habeas hearing on the trial court's allowing the Bible to go out with the jury, Mr. Green testified: "I have no recollection of that at all." (H.T. 34).

fact that petitioner's counsel asked about the community's knowledge of the case in front of each prospective juror. This issue was raised by the petitioner and decided adversely to him in his first state habeas corpus proceeding in Butts County. (Respondent's Exhibit No. 17, page 9). The state habeas corpus court held as follows:

The request for individual, sequestered voir dire is a matter entirely within the discretion of the trial court and will not be upset absent a showing of manifest abuse of that discretion. *Whitlock v. State*, 230 Ga. 700, 706 [198 S.E.2d 865] (1973); *Stinson v. State*, 244 Ga. 219, 221 [259 S.E.2d 471] (1979).

Petitioner has shown no abuse of the trial court's discretion. Petitioner has claimed that prejudicial information was communicated among the veniremen but has not demonstrated any harm resulted, if, in fact, such occurred.

(Respondent's Exhibit No. 17, pages 8–9). The Supreme Court of Georgia, in affirming the state habeas corpus court's denial of relief, stated:

As to the trial court's denial of the appellant's request for sequestered voir dire, this is a matter within the discretion of the trial court, and no abuse of discretion can be established without a showing of prejudice; no showing of prejudice has been made here.

*Jones v. Francis*, 252 Ga. at 62–63, 312 S.E.2d 300 (citations omitted).

■■■ While there is no constitutional mandate compelling the use of sequestered voir dire, this court nevertheless must determine whether the petitioner was denied his right to a fair and impartial jury under the circumstances of this case. While a federal habeas corpus court does not act as a "super state supreme court," *Shaw v. Boney*, 695 F.2d 528, 530 (11th Cir.1983), it is the duty of the reviewing court to independently evaluate the voir dire testimony of the impaneled jurors. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1960). The Supreme Court of the United States in *Patton v. Yount*, 467 U.S. 1025,

1031, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984), *citing Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961), stated that a trial court's finding of impartiality of the jury as a whole can be overturned only for "manifest error." For the reasons set forth below, the court finds that voir dire was conducted in this case in a manner sufficient to protect the petitioner's constitutional rights.

■■■ At the beginning of the voir dire proceedings, the trial court stated as follows:

Show by agreement that the voir dire, the statutory voir dire questions, will be propounded to the four panels as they are seated in the courtroom and then the individual questions to the twelve as placed upon the defendant in the jury box. Also, the question as to any inconvenience as to sequestration of the jury (sic).

(T. 2).

The trial court then read the indictment to the jurors and asked them the statutory questions. (T. 2–4). The trial court inquired at that point whether, if the jury were to be sequestered, there would be any unusual hardship on any potential juror. (T. 4–7).

Then, defense counsel asked the jury, by panels, the following questions:

For any reason have any of you jurors formed and expressed any opinion in regard to the guilt or innocence of the prisoner at the bar?

Is your mind perfectly impartial between the State and the accused?

(T. 7).

The court then excused the jurors in the courtroom for thirty minutes, except those in the box, but asked that the jurors remain on the same floor as the courtroom for that period of time. (T. 10). Individual voir dire was then conducted of the jurors, by panels, by the state and defense counsel. Wide latitude was granted to the defense in questioning the individual jurors. (*See* Appendix A).[9]

---

9. The Court, in Appendix A to this Opinion and Order, has set forth in detail the wide range of questioning allowed by the trial court during voir dire.

An examination of all of the voir dire proceedings, which cover some 350 pages, reveals that there were very few restrictions placed by the trial court on the questioning of prospective jurors by defense counsel. In fact, there was not a limitation on the number of questions to be asked and barely any limitation on the scope of the questions. Additionally, a review of the questioning of the prospective jurors reveals a remarkable candidness and frankness in their responses to questions and an ability of defense counsel to elicit from the prospective jurors their opinions about the death penalty, their knowledge of the case, and any prior disposition that they might have brought to their deliberations.

Very few of the jurors had read or heard much about the case and what they had heard was only in general terms, i.e., that there had been a murder and armed robbery which had taken place at a service station. There was no revelation of deep-seated feelings or opinions about this particular case or this particular defendant so as to establish that the community was so enraged that the trial court should have exercised its discretion to permit sequestered individual voir dire.

For the reasons stated above, the Court finds that the petitioner's right to a fair trial was not violated by the trial court's decision to disallow sequestered voir dire.

In paragraph 32 of his petition, petitioner complains that the trial court improperly denied his counsel's request for ten minutes to review his notes and confer with his client prior to the exercise of his preemptory challenges and that the trial court improperly limited the petitioner's counsel to one minute to decide on each strike. As a result of these rulings of the trial court, petitioner's jury was allegedly selected in a "hurried and uninformed manner." (Petition, ¶ 32). This issue was raised by the petitioner in his appeal to the Supreme Court of Georgia and the Georgia Supreme Court held as follows:

Appellant [petitioner] argues that the trial court erred in invoking Rule 58 of the "Rules of the Superior Courts" (Code Anno. § 24–3358), prior to striking a jury. This rule provides, '[I]n striking juries, not more than one minute shall be allowed either party for each strike; and if either party should fail to strike, by such failure he shall forfeit a strike; and if more than twelve jurors remain on the jury list, the first twelve not stricken shall constitute the jury.'

After the parties had made challenges for cause, but prior to striking the jury, the trial court announced its intention to invoke the rule of Code Anno. § 24–3358. Appellants did not object at this time but waited until the jury had been struck and dismissed for the night to voice his objections to the one minute limitation.

Four times during the striking of the jury, the trial court notified the appellant that appellant had taken in excess of one minute to decide whether to strike a juror or not. However, on none of these occasions did the trial court require the appellant to forfeit the strike. In fact, the record indicates throughout the striking of the jury appellant was allowed to take over one minute in deciding whether to strike each juror without penalty.

While we agree with appellant that counsel should be given a reasonable time in which to decide whether to strike a potential juror, we know that the trial court is vested with a broad discretion to determine how much time is reasonable. We cannot say, under the circumstances of this case, the trial court abused that discretion. Further, we note that appellant has not shown that he was harmed by the time limitation imposed upon him. *Jones v. State, supra* 249 Ga. at 609–610, 293 S.E.2d 708.

The rule at stake in petitioner's challenge is a state procedural rule. As such, no constitutional question is involved, and the Georgia Supreme Court's ruling is entitled to deference. *See Bronstein v. Wainwright*, 646 F.2d 1048, 1050 (5th Cir.1981). Therefore, this court defers to the judgment of the Georgia Supreme Court's determination that the trial court did not abuse its discretion by invoking a one minute limitation on petitioner's counsel in determining which jurors to strike.

### C. *The Trial Court's Failure to Exclude Jurors for Cause*

In Section C, paragraphs 33–35, petitioner claims that the trial court failed to grant any challenges for cause, despite the fact that several jurors allegedly expressed bias which would interfere with their ability to be fair and impartial in considering the petitioner's case. Specifically, the petitioner refers the court to the voir dire testimony of venire persons Savage, Wright, and Merton.

In paragraph 35 of his petition, petitioner submits that the trial court's rejection of defense counsel's challenge to venire person Savage for cause constitutes reversible error. Venire person Savage was challenged for cause because he remembered "some of the circumstances" of the case from media reports (T. 88), and he had "an opinion after he read" the accounts (*Id.*) that "something had to be done about it." (T. 89; *see also* T. 346).

The United States Supreme Court stated in *Irvin v. Dowd, supra:*

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

366 U.S. at 722–723, 81 S.Ct. at 1642–43 (citations omitted).

 Prospective juror Savage, whom petitioner claimed had a preconceived opinion about this case so as to warrant his excusal for cause, stated during the voir dire proceedings that "I remember seeing something in the paper about it. I know when it [crime] first happened, but I don't remember much about it." (T. 88). Mr. Savage stated that he remembered seeing something in the paper about it right after it happened but that he did not read the article thoroughly. (T. 88). When asked whether what he had read would come back to his mind again if he was a juror in the case, Mr. Savage stated, "Well, I believe probably everyone has an opinion after they read something." (T. 88).

Upon further examination, however, it appears that the "opinion" Mr. Savage held, was not about this particular case, but rather was in regard to his opinion or belief that something had to be done about the crime rate. (T. 89). As Mr. Savage stated, "Well it [his opinion] is not just one case, it is on all things." (T. 89). This general opinion, unrelated to petitioner's specific crime was further clarified when Mr. Savage stated that he was familiar neither with any of the claims involved (T. 88) nor with the names of those being accused of the crime. (T. 90). Furthermore, the trial court asked Mr. Savage if he had an opinion that could not yield to the evidence, and Mr. Savage replied that he did not. (T. 346). Inasmuch as Mr. Savage's voir dire testimony fails to indicate that he had any preconceived notions about the petitioner or the facts of the crime, and inasmuch as Mr. Savage testified that he did not have an opinion which would not yield to the evidence, this court finds that the trial court did not abuse its discretion in overruling petitioner's challenge to Mr. Savage for cause.

Petitioner also claims the trial court committed reversible error by rejecting petitioner's counsel's challenges for cause against those jurors who allegedly displayed bias toward prosecution witnesses. Throughout voir dire, petitioner's counsel asked potential jurors whether they would give more credence to official or police witnesses than lay witnesses. (T. 2–358). Prior to striking a jury, petitioner's counsel challenged for cause jurors Butler, (T. 54–55), Merton (T. 61–62), Williamson (T. 67–

68), Younglove (T. 76–77), and Wright (T. 83) because of their responses to this question. (T. 345–46). The trial court overruled the challenges.

██ An examination of the responses of prospective jurors to petitioner's counsel's questions about whether these prospective jurors would give more credence to police officers than lay witnesses does not establish that the jurors were in fact more favorable to the state's case. Thus, the trial court did not err in overruling the challenges to prospective jurors Butler, Merton, Williamson, Younglove, and Wright.

### D. *Petitioner's Statements to Private Security Officer Woolard*

In Section D, paragraphs 33–35, petitioner contends that the introduction into evidence of certain oral statements made by petitioner to private security officer Alex Woolard violated petitioner's rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. Specifically, petitioner contends that security officer Wollard was acting as an "agent" for Cobb County police officer Kindel (who, as noted in the Statement of Facts, arrested petitioner and his co-defendant). Petitioner further argues that, although Officer Kindel read the petitioner his *Miranda* warnings, the petitioner never expressly waived his rights; thus, the information given to Alex Woolard by the petitioner was improperly admitted at trial.

Mr. Woolard testified at trial as follows: I said, 'Why don't you tell me what is going on, the whole storey (sic).' And he said, 'I might get in too much trouble.' And he kept looking up—his face was down, this way, and he would look up through the windshield to the back where the other subject was sitting and then put his head back down again. He did this two or three times. When I asked them (sic) a question—it was ap-

proximately 30 minutes after I arrived on the scene—in talking to him, that he decided—he told me, he said, 'Well, I might as well tell you—', he said, '—that there is a man in the back, hurt.' And I said, 'What do you mean "hurt"?' He said, 'He is hurt bad, he is bad hurt,' is what he said. I said, 'Has he been beaten up or what?' He said, 'No. He has been shot.'

(T. 491).

██ The first question which this court must address is whether private security officer Woolard was acting as an agent of Officer Kindel. Whether Woolard was acting as a state agent is a question of law, which this court must reevaluate de novo. *See, e.g., Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (issues surrounding voluntariness of confession are questions of law meriting independent consideration by federal habeas court); *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) (federal court should defer to state court findings of fact made after a full and fair hearing, but may not defer to its findings of law). It is undisputed that Woolard and Officer Kindel worked in unison to detain the petitioner and his codefendant. Woolard, a former sheriff (T. 485), arrived in response to Kindel's dispatch call (T. 487); Kindel asked for and used Woolard's handcuffs (T. 485–487); and Kindel and Woolard alternated guarding the suspects while the other searched first the car and the store. (T. 488). Kindel directed Woolard in the course of these actions. (T. 492).[10] On the basis of these facts and the testimony attached as Appendix B to this Opinion and Order, this court finds that Woolard was acting as an agent of the state at the time that the petitioner made the above-quoted incriminating statements. *See United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (an inmate in jail enlisted by police to inform on other inmates is agent of the state).[11]

---

10. Because Mr. Woolard's testimony at trial is essential to this court's determination regarding his status as an agent of the state, the court has attached the relevant portions of his direct testimony as Appendix B to this Opinion and Order.

11. While *Henry* supports the finding that Woolard was acting as an agent of the State, *Henry* is distinguishable from this case in an important respect. In *Henry,* the inmate acting as an agent garnered his information surreptitiously.

The second issue which this court must address is whether Mr. Woolard, acting as an agent of a state law enforcement agent, had a duty to give the petitioner new *Miranda* warnings before questioning him. Officer Kindel has testified, and petitioner does not dispute, that Officer Kindel gave petitioner and his co-defendant their *Miranda* warnings when he arrested them. The record is also clear on the point that Mr. Woolard did not re-administer *Miranda* warnings before he began to question the petitioner.

The court finds that *Miranda* warnings were not necessary at all under the exigent circumstances. The questions posed by Mr. Woolard were not aimed at establishing petitioner's guilt. Rather, the questions were aimed at determining whose car was in front of the store and whether there was another person on the premises for if there were, it was obvious such other person was incapacitated in some way from making himself known. *Miranda* itself, (*Miranda v. Arizona,* 384 U.S. 436, 477, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966)) held that "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding"; *see also Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) ("the definition of interrogation can extend *only* to words or actions on the part of police officers that *they should have known* were reasonably likely to elicit an incriminating response") (emphasis added).

■ The record indicates that Mr. Woolard arrived on the scene shortly after Officer Kindel apprehended the suspects. (T. 487). The record also indicates that Officer Kindel and Mr. Woolard were working together to try to solve the puzzle of what had occurred at the station. *See* Appendix B. The record reflects that the questions asked of the petitioner by Woolard were part of a continuing investigation and interrogation aimed at discerning what had oc-

curred at the service station. There is no duty to repeat *Miranda* warnings where the questioning is part of a continuing interrogation. *Watson v. State,* 227 Ga. 698, 700, 182 S.E.2d 446 (1971) (no new Miranda warnings necessary although seven hours had elapsed since initial warnings given); *Williams v. State,* 244 Ga. 485, 488, 260 S.E.2d 879 (1979) (no repetition of warnings necessary even though day had elapsed). Thus, assuming *arguendo* that *Miranda* warnings were required under the circumstances, the court finds that, as a matter of law, Mr. Woolard was under no duty to readminister *Miranda* warnings.

■ The next issue which the court must address is whether the petitioner's statement to Mr. Woolard that he did not want to tell "what is going on" because he "might get in too much trouble" (T. 491) can be interpreted as an attempt to invoke his rights under *Miranda.* While the petitioner's statement does indicate hesitancy to tell Woolard what happened, it clearly indicates an investigation of a currently continuing dangerous situation—dangerous not only to the persons talking but also to unknown third persons. The court finds that this momentary reluctance to answer a currently pressing question does not rise to the level of an assertion of his *Miranda* rights, nor does it arise to the level of an equivocal invocation necessitating follow-up questioning as to the petitioner's desire with respect to terminating the questioning. The petitioner did not refuse to answer Mr. Woolard's questions. He did not ask Woolard to stop asking questions. He did not ask for an attorney. Under these circumstances, the court finds no implied assertion of rights. *See, e.g., Reeves v. State,* 241 Ga. 44, 243 S.E.2d 24 (1978), *cert. denied,* 439 U.S. 854, 99 S.Ct. 165, 58 L.Ed.2d 160 (1978) (the statement "I ain't saying nothing" held not to amount to assertion of right to remain silent); *Taylor v. Riddle,* 563 F.2d 133 (4th Cir.1977), *cert. denied,* 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1977) ("You've done asked me

Here, Woolard was obviously working with the law enforcement agents on the scene. *See infra* footnote 13.

a question I can't answer" held not to amount to claim of privilege).

In *Martin v. Wainwright*, 770 F.2d 918 (11th Cir.1985), *modified, reh'g and reh'g en banc denied*, 781 F.2d 185 (1986), *cert. denied*, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986), the United States Court of Appeals for the Eleventh Circuit addressed the issue of what procedures an interrogator should follow when a person being interrogated makes an equivocal invocation of the right to cut off questioning. In *Martin*, the petitioner was arrested at about 2:30 p.m. and was interrogated, off and on, from 2:30 until 7:55 p.m. when he finally confessed. 770 F.2d at 922. At some point during his interrogation, the petitioner said "Can't we wait until tomorrow?" His interrogator responded: "Let's go on." *Id.* at 923. On these facts, the Eleventh Circuit held that the petitioner had made an equivocal invocation of his rights which gave rise to a duty on the part of the interrogator to attempt to clarify whether petitioner intended to invoke his right to cut off questioning. *Id.* at 924. The Court held that the questioner's failure to clarify petitioner's intent violated the dictates of *Miranda* and *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

This court finds the instant case distinguishable from *Martin* in an important respect. Assuming *arguendo* that Woolard's questioning reached the level of "interrogation" as that term is defined in *Rhode Island v. Innis, supra,* (so that *Miranda* warnings were necessary),[12] the petitioner's protestation with respect to Woolard's questioning is markedly different from that in *Martin*. In *Martin*, the petitioner's statement indicated a desire to postpone his questioning. The petitioner's statement here evinces no such desire. The court finds that the petitioner's statement that "I might get in too much trouble" manifests a momentary reluctance which not only falls

short of even an equivocal invocation of the right to cut off questioning of the type discussed in *Martin*, but was in response to a question clearly necessary to unravel an obviously dangerous situation.

■■■ The last question the court must address with respect to the admission of petitioner's statement to Woolard is whether petitioner's statement that there was a body in the back of the store (preceded by the statement "I might as well tell you") amounts to a waiver of his *Miranda* rights. The court has little trouble finding that it does.

The United States Supreme Court held in *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) that "an explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel guaranteed by the *Miranda* case." 441 U.S. at 375–76, 99 S.Ct. at 1758–59. As two leading commentators on criminal procedure have noted: "[A] finding of waiver is likely when the defendant has engaged in certain conduct falling a bit short of an express waiver, such as a declaration of a cooperative attitude or even a nod or a shrug." 1 W. LaFave and J. Israel, *Criminal Procedure* § 6.9(d) at 531 (1984 and Supp.1988) (footnotes omitted). Here, the petitioner's declaration of a cooperative attitude was denoted by his remark "I might as well tell you ..." (T. 491). *See United States v. Boykin*, 398 F.2d 483, 484 (3rd Cir.1968), *cert. denied*, 393 U.S. 1032, 89 S.Ct. 645, 21 L.Ed.2d 575 (1969) (defendant's statement, after being read his rights, that "I might as well tell you about it" constitutes waiver of *Miranda* rights).[13] Thus, the court finds that petitioner's statement to Woolard was not admitted in violation of petitioner's rights.

### E. *Violation of Confrontation Clause*

In Section E of his petition, the petitioner alleges as follows:

---

**12.** *See supra* footnote 11 and accompanying text.

**13.** The court notes that there is nothing in the record to indicate that the petitioner thought he was talking to someone who was *not* a police

officer. In fact, the record suggests that the petitioner may have thought that Mr. Woolard was a police officer. Thus petitioner does not argue that he thought he was confiding in someone who was not a law enforcement agent.

40. The introduction into evidence of an oral statement made by Petitioner's codefendant, who was separately tried, to a police officer violated Petitioner's rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

41. During Petitioner's trial, arresting officer Kindle (sic) testified about the procedure he used in placing Petitioner and co-defendant Solomon under arrest. While he was ordering each man to lie down on the floor, Kindle (sic) testified that he asked both men what they were doing in the store. Petitioner made no response. Kindle (sic) testified however that Solomon responded, 'burglarizing' (T. 445).

42. This statement of Solomon's was hearsay. Solomon was not presented as a witness at any time and was not available for cross-examination by Petitioner at trial. The admission of the statement was particularly prejudicial because it provided the State with a motive to explain Petitioner's presence in the store. While its admission violated the rules of evidence barring hearsay, it also violated Petitioner's constitutional right to confront his accuser.

The state habeas corpus court rejected this contention finding that:

> The Sixth Amendment provides that an accused in all criminal prosecutions shall enjoy the right to be confronted with the witnesses against him. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The purposes served by the right of confrontation are to insure that the statements of witnesses are under oath, to force the witness to submit to cross-examination, and to permit the jury to observe the demeanor of the witness. *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Petitioner has claimed under the authority of *Pointer* that Officer Kindel's testimony concerning Solomon's statement violated his right to confrontation because Solomon's statement was hearsay, Solomon did not testify, and Solomon was not available for cross-examination. However, Petitioner himself at the scene of

the crime told Mr. Woolard that he and Solomon had come there to burglarize the place. (T. 490–91). At trial Petitioner testified that Solomon told Officer Kindel they had talked about burglarizing the store. (T. 715–16). Thus, the testimony of Officer Kindel as to Solomon's statement was cumulative of evidence given by Petitioner himself. Any possible error in the admission of Solomon's statement was harmless.

(Respondent's Exhibit No. 17, page 13).

■ Inasmuch as petitioner's own statement regarding his reasons for being in the store were properly admitted, and coincided with the Solomon statement, this court finds that any error in the admission of Solomon's statement to officer Kindel was harmless.

### F. *The Trial Court's Instruction on Malice*

■ In Section F, paragraphs 43–45 of his petition, the petitioner contends that the trial court's instruction to the jury on the requisite element of malice violated his right against conviction except upon proof beyond a reasonable doubt of this element of the offense of murder. The petitioner claims that this alleged shifting to the petitioner of the burden of persuasion on this element violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States.

The petitioner was charged in a one count indictment with malice murder, the elements of which are the unlawful killing of another human being with malice aforethought. The trial court instructed the jury as follows with regard to proof of malice:

> Malice may either be express or implied. It is express when it is manifested by external circumstances capable of proof. When the deliberate purpose to take life has been established, the jury may find express malice. Preparation for the act of killing, threat to kill and like evidence may establish express malice.
> *Malice shall be implied* where all the circumstances of the killing show an

abandoned and malignant heart, which may be evidenced by the use of a weapon likely to produce death.

*The law presumes that every homicide which resulted from the use of a deadly weapon in its usual and customary manner was malicious.*

(T. 809) (emphasis added).

Petitioner also claims that the jury was instructed to infer all the acts of the petitioner's alleged coconspirator, Solomon, to the petitioner:

Now it is contended by the State that the defendant committed the crime charged in this indictment when he, together with the co-defendant named in this indictment conspired to commit the crime of armed robbery and that the murder of the person named in this indictment was an incidental probable consequence of the commission of the armed robbery agreed upon by them.

(T. 806). Petitioner argues that the combination of these charges permitted petitioner's conviction for malice murder without requiring the prosecution to shoulder its burden of proof beyond a reasonable doubt on the issues of malice, intent and even murder itself.[14]

The court finds that the above-quoted instruction on malice was clearly impermissibly burden-shifting under *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) (jury instruction that

"the law presumes a person intends the ordinary consequences of his voluntary acts" violates Fourteenth Amendment due process rights by creating a mandatory presumption which unconstitutionally shifts burden of proof to defendant). *See also Drake v. Kemp,* 762 F.2d 1449, 1452–53 (11th Cir.1985) (en banc), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986) (jury instruction that "the acts of a person of sound mind and discretion are presumed to be the products of a person's will and a person of sound mind and discretion is presumed to intend the natural and probable consequences of his act, but both of these presumptions may be rebutted" is impermissible burden-shifting instruction under *Sandstrom*).[15]

Determining that the trial court's instruction was unconstitutionally burden-shifting does not end the analysis, however. A violation of *Sandstrom* may be harmless error. *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (harmless error analysis applies to *Sandstrom* violations); *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 3119–20, n. 5, 97 L.Ed.2d 638 (1987) (*Sandstrom* violation harmless when evidence so dispositive of intent that it can be said beyond a reasonable doubt that jury would have found it unnecessary to rely on the presumption). The most recent Eleventh Circuit case offering guidance to lower courts on whether

14. The petitioner fails to distinguish between malice and intent for purposes of determining whether a *Sandstrom* error has occurred, and if so, whether it was harmless beyond a reasonable doubt. The petitioner may have chosen to fuse these two elements because his petition alleges only an impermissibly burden-shifting instruction with respect to malice and is silent as to intent. In Petitioner's Fifth Brief in Support of his Petition, the petitioner argues that the above-quoted instructions together shifted to petitioner the state's burden to prove malice and intent. While the petitioner does not address the trial court's instruction on intent, he does seem to argue that the quoted instructions touched upon intent. Thus, this court will treat the petitioner's argument on intent as properly before it. *C.f. Stephens v. Kemp,* 846 F.2d 642, 659 n. 12 (11th Cir.1988), *reh'g and reh'g en banc denied,* 849 F.2d 1480 (11th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988).

15. While it is well established law that a single instruction to the jury may not be judged in isolation but must be viewed in the context of the overall charge, *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), it is also clear that "language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity." *Francis v. Franklin,* 471 U.S. 307, 322, 105 S.Ct. 1965, 1975, 85 L.Ed.2d 344 (1985). A review of the record indicates that the trial judge did offer the jurors instructions which contradicted the burden-shifting nature of the malice instruction. (T. 798, 801–802, 805–806, 808). However, because "[a] reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict," 471 U.S. at 322, 105 S.Ct. at 1975, the court must find that the malice instruction, despite the judge's correct charges, amounted to error.

a *Sandstrom* error is harmless is *Bowen v. Kemp,* 832 F.2d 546, 548 (11th Cir.1987) (en banc), *cert. denied,* — U.S. —, 108 S.Ct. 1120, 99 L.Ed.2d 281, — U.S. —, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988). In *Bowen,* the Eleventh Circuit stated:

> In applying harmless error analysis to *Sandstrom* violations, this court has identified two situations where the harmless error doctrine can be invoked: (1) where the erroneous instruction was applied to an element of the crime that was not at issue in the trial, or (2) where the evidence as to defendant's guilt was overwhelming.

As intent and malice were at issue at petitioner's trial,[16] the first prong of the *Bowen* analysis is inapplicable. Turning its attention to the second prong of the harmless error test articulated in *Bowen,* the court finds, for the reasons discussed below, that the evidence as to petitioner's guilt was sufficiently overwhelming to render the *Sandstrom* violation harmless.

The Eleventh Circuit has made clear that when a court evaluates the question of overwhelming evidence of guilt, the focus must be on the evidence relating to the subject matter of the burden-shifting instruction, here malice and intent. *See, e.g., Dick v. Kemp,* 833 F.2d 1448 (11th Cir. 1987) (defendant's voluntary intoxication defense placed intent in issue and because evidence of intent to kill was not overwhelming, *Sandstrom* error was not harmless). A review of the facts of this case leads the court to conclude that there exists overwhelming evidence of malice and intent.

The record strongly suggests that the petitioner and his co-defendant laid in wait for Mr. Tackett. The evidence indicates that the perpetrators ambushed Mr. Tackett as he was leaving the store, led him back inside the Tenneco, and forced him to show them the location of the cash drawer (which was hidden each night on the top shelf in the walk-in cooler). (T. 398). After the perpetrators had gotten the money from the cash drawer, they did not tie Roger Tackett up. They did not hit him with a blunt instrument to momentarily incapacitate him. Rather, after peeking out the storeroom to see if anyone was around who might hear the shots and seeing no one, they pumped five bullets into him from close range and left him to die on the storeroom floor.

On these facts, the court concludes that the evidence on intent and malice was so dispositive that it can be said beyond a reasonable doubt that the jury would have found it unnecessary to rely on the presumption created by the burden-shifting instruction. Thus, the *Sandstrom* error was harmless. *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). *See also, Potts v. Kemp,* 814 F.2d 1512 (11th Cir.1987) (burden-shifting instruction on intent was harmless where evidence showed that defendant drove victim around for a while, constantly threatening him, then drove to a dirt road and shot him through the head); *Stephens v. Kemp,* 846 F.2d at 642 (where defendant walked around police officer's vehicle, raised shotgun, and deliberately shot police officer, burden-shifting instruction on intent was harmless error); *Williams v. Kemp,* 846 F.2d 1276 (11th Cir.1988) (*Sandstrom* error harmless under *Rose v. Clark* due to overwhelming evidence of intent to kill).

### G. *The Trial Court's Instruction on Conspiracy*

In Section G, paragraphs 46–48, petitioner contends that the trial court's instruction to the jury concerning conspiracy to commit the crime of armed robbery violated the petitioner's constitutional rights under the Fifth and Fourteenth Amendments.

---

**16.** The respondent argues that intent and malice were not at issue at trial because the "petitioner did not contest that whoever killed the victim did so maliciously and intentionally." Respondent's Brief at 84. The court does not agree with this argument. The fact that the petitioner denied killing the victim was sufficient to place the burden on the state to prove intent and malice, thus placing those elements at issue. *See Bowen v. Kemp, supra,* (even though juries found that defendants failed to prove their insanity defenses by a preponderance of the evidence, issue of intent was not conceded and state was required to prove intent element of the crime; therefore, *Sandstrom* error could not be harmless on ground that intent not at issue).

Petitioner contends that because he was indicted on one count of malice murder and was not charged with conspiracy to commit armed robbery that the trial court's instruction concerning conspiracy was erroneous because the record allegedly provided no support for the State's view that petitioner and co-defendant Solomon desired to commit an armed robbery. In essence, petitioner argues that there was no evidence establishing a conspiracy between petitioner and the co-defendant. The petitioner argues that the jury was permitted "to find Mr. Jones guilty of murder merely upon a finding that he conspired to commit an armed robbery, although he had only been charged with malice murder." Petitioner's Fifth Brief in Support of His Petition for Habeas Corpus at 26. Petitioner further argues that "because at no time was the jury instructed on the elements of armed robbery—and even the prosecutor (T. 838–839), let alone the lay jurors, equated robbery with burglary—there is an intolerable possibility that the jury believed Mr. Jones guilty solely of intending to commit a burglary and yet found him guilty of murder." *Id.* at 26–27.

■■■■■ Respondent submits, and this court agrees, that in light of the evidence presented at trial and the notice provided by the State of its intention to rely on the statutory aggravating circumstance of murder committed during the commission of an armed robbery, the trial court was authorized to give a conspiracy charge. It is undisputed that the petitioner and his counsel were aware that the State intended to seek the death penalty and that one ground for seeking the death penalty was that the statutory aggravating circumstance of murder during the commission of a felony, to wit, armed robbery, was present in this case. While it is true that the petitioner was not indicted for armed robbery, it is not necessary for the State to obtain a conviction for the crime which

forms the basis of an aggravating circumstance in order to allow a jury to find such an aggravating circumstance for sentencing purposes. *Fair v. State*, 245 Ga. 868, 871–72, 268 S.E.2d 316 (Ga.1980), *cert. denied*, 449 U.S. 986, 101 S.Ct. 407, 66 L.Ed. 2d 250 (1980) (fact that defendant was later acquitted on charge giving rise to aggravating circumstance at first trial irrelevant as to whether trier of fact was presented with sufficient evidence to find beyond a reasonable doubt the existence of an aggravating circumstance); *Pryor v. State*, 238 Ga. 698, 703, 234 S.E.2d 918 (1977), *cert. denied*, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed. 2d 294 (1977).

In addition to setting forth the technical elements of the law of conspiracy, the trial court's charge on conspiracy explained to the jury that:

> Whether or not a conspiracy existed, whether or not its existence has been shown by direct or circumstantial evidence, whether or not the Defendant now on trial was a party to it are all questions for the jury to determine. If you should determine that there was no conspiracy or that the Defendant now on trial was not a party to it, or if you have a reasonable doubt as to this issue, then, in any of these events, you should entirely disregard in your deliberations this instruction relating to conspiracy.

(T. 807–808).

■■■■■ In light of the notice provided to petitioner that the State intended to argue that Mr. Tackett's murder occurred while the petitioner and his co-defendant were committing armed robbery, and in light of the trial judge's cautionary explanation regarding the existence of conspiracy, (and in light of the evidence produced at trial indicating that a reasonable juror could find the existence of conspiracy), this court finds that the trial court did not err when it gave its charge on conspiracy.[17]

---

17. The court notes that the trial court failed to charge the jury as to what constitutes armed robbery. This court finds that the trial court's failure to set forth the elements of armed robbery was harmless error. First, with respect to the statutory aggravating circumstance of mur-

der committed during the commission of a felony, to wit, armed robbery, the court notes that the state claimed the existence of another statutory aggravating circumstance (crime was wantonly vile and inhuman and involved aggravated battery to the victim), a circumstance the exist-

### H. *The Prosecutor's Closing Argument*

In Section H, paragraphs 49–52 inclusive, petitioner alleges that the prosecutor made improper comments during the closing argument of the guilt/innocence phase of petitioner's trial so as to allegedly deny petitioner his rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution. Specifically, petitioner objects to the prosecutor's stating that the police investigation had been very meticulous and that "no stone was left unturned in this particular case." (T. 746). Petitioner also claims that the prosecutor's remark that "Well, I saw what Roger Tackett went through and I don't like it one bit," (T. 760), was an improper expression of the prosecutor's personal opinion.

This court, for the reasons set forth below, finds that there was no denial of the petitioner's right to a fundamentally fair trial.

In *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), the Supreme Court of the United States outlined the standards for determining when a prosecutor's argument constitutes a denial of due process. The Court stated:

> The question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' *Donnelly v. DeChristoforo,* 416 U.S. 637 [94 S.Ct. 1868, 40 L.Ed.2d 431] (1974). Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrower one of due process, and not the broad exercise of supervisory power.' *Id.* at 642 [94 S.Ct. at 1871].

*Darden v. Wainwright,* 477 U.S. at 181, 106 S.Ct. at 2472.

As the Eleventh Circuit noted in *Brooks v. Kemp,* 762 F.2d 1383, 1400 (11th Cir. 1985), *vacated and remanded in light of Rose v. Clark,* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed. 732 (1986):

The *Donnelly* decision provides important guidelines for reviewing alleged improper prosecutorial argument. Of primary importance is the need to examine the entire context of the judicial proceeding. Thus, it is not our duty to ask whether a particular remark is unfair, we are concerned if whether it rendered the entire trial unfair. In this regard, isolated or ambiguous or unintentional remarks must be viewed with lenity.

*Brooks v. Kemp,* 762 F.2d at 1400.

■ The first remark objected to by petitioner relates to the prosecutor's remark that "no stone was left unturned" in the presentation of the case. A review of this comment in context reveals that the prosecutor was describing for the jury the types of evidence which they would review in a "real life trial" (T. 745). The prosecutor was explaining to the jury that facts could be presented to them in various forms including eyewitness testimony, eyewitness testimony by way of tangible objects, expert testimony, and investigative testimony, including that of law enforcement officers who conducted "a very meticulous investigation in this case." (T. 746). The allegedly improper statement was made in the context of the prosecutor's stressing to the jury that, "there is not much missing [in the way of evidence], to be frank, if anything, in this case for the State to prove. The evidence is there." (T. 746). Therefore, viewed in context, the remark that the state left "no stone unturned" was merely an attempt to stress the strength of the State's evidence to the jury. Thus, the remark was not improper.

■ As to the prosecutor's statement that he did not like "one bit" what the victim went through (T. 760), the court, after a review of the record, finds that this remark was an isolated one, insufficient to render the petitioner's trial fundamentally unfair.

For these reasons, the court finds that the prosecutor's remarks in the guilt/in-

---

ence of which the evidence supports. Second, with respect to the trial court's charge on conspiracy, this court finds that the jury had sufficient evidence before it to find a *conspiracy* to commit armed robbery, even if the jury did not know precisely what the elements of armed robbery were.

nocence phase did not deny the petitioner his right to a fundamentally fair trial.

IV. Legal Discussion: Sentencing Phase

Petitioner alleges sixteen separate grounds for vacating his sentence because of improper action by the trial court and the prosecutor during the sentencing phase of his trial. Because the court finds the claims raised in Sections J and M of the petition to be meritorious, it need not address the petitioner's other fourteen allegations. *Blake v. Kemp*, 758 F.2d 523 (11th Cir.1985), *reh'g and reh'g en banc denied*, 763 F.2d 419 (11th Cir.1985), *cert. denied*, 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985). The court, nevertheless, will succintly address each of the petitioner's fourteen other allegations after discussing the arguments contained in sections J and M of the petition.

A. *Christian Bible Permitted in Jury Room*

In Section M, paragraph 65 of his petition, the petitioner states:

65. The trial court, in violation of Petitioner's rights guaranteed by the Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States, permitted the jury to take out with it, and have available to it, during the course of its deliberations, a Christian Bible not introduced into evidence by the State or Petitioner nor in any way connected to Petitioner's case or his trial. (T. 879).

A review of the trial transcript reveals the following interchange:

[THE COURT]: Now, at this time I am going to send you back to the juryroom, send you out for your noon refreshment, and then, when you have had your noon refreshment, return to the juryroom, and begin your consideration of the punishment and complete your verdict by fixing the penalty that shall be imposed upon the Defendant, and then return into Court for publication.

So, you twelve jurors may retire at this time.

MR. SWEATT: We want to know if we will be allowed to take the Bible back with us?

THE COURT: Yes, sir.

(T. 878–89).

Justice Brennan, while an appellate judge in New Jersey, noted that it is a matter of "elementary principles [that] the jury's verdict must be obedient to the court's charge and be based solely on legal evidence properly before the jury." *Palestroni v. Jacobs*, 77 A.2d 183, 10 N.J.Super. 266 (1950). For this reason, the introduction to the jury of extraneous materials or evidence has consistently been held to mandate a new trial. The courts have condemned the use of a common dictionary by jurors where there exists a reasonable possibility that it was used to define legal terms, or act as a substitute for instructions in the jury's deliberations. *See, e.g., Palestroni*, (reversal due to jury's use of dictionary); *Alvarez v. People*, 653 P.2d 1127 (Colo.1982) (same); *Smith v. State*, 95 So.2d 525 (Fla.1957) (same). Justice, then Judge, Brennan expressed the logic of the prohibition against dictionaries as follows:

The use by a jury of a dictionary has an obvious potentiality for harmful influence. The danger is ever present it may be employed to ascertain meanings not just of one but of many words used in the court's charge or in papers in evidence. The juror's word alone that its use was limited is too weak a reed upon which to rest the difficult decision whether the verdict was subject to improper influence. Jurors should be required to advise the judge in open court of their doubt and desire for guidance and should be instructed by him in the presence of counsel if counsel care to attend.

*Palestroni*, 77 A.2d at 186.

The outcome has been similar when the material at issue was a legal or quasi-legal text. For example, in *Moore v. State*, 172 Ga.App. 844, 324 S.E.2d 760 (1984), consultation of a Readers' Digest guide entitled "You and the Law" was deemed misconduct sufficient to require a retrial, despite the fact that the court could not determine what effect (if any) the improper material

had on the jury. Due process was undermined, the court concluded, when the jury sought instruction in the law from a source other than the court. *See* 172 Ga.App. at 846, 324 S.E.2d 760.

■ It is well settled that religion may not play a role in the sentencing process. *See, e.g., United States v. Giry*, 818 F.2d 120 (1st Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 162, 98 L.Ed.2d 116 (1987) (reference to Bible is improper appeal to jurors' private religious beliefs); *Evans v. Thigpen*, 809 F.2d 239 (5th Cir.1987), *reh'g and reh'g en banc denied*, 814 F.2d 658 (5th Cir.1987), *cert. denied,* — U.S. —, 107 S.Ct. 3278, 97 L.Ed.2d 782 (1987) (biblical evidence irrelevant at sentencing phase). In a recent case similar to the instant one, the Tennessee Supreme Court held that a jury foreman's reading of Biblical passages to the jury during deliberations in the penalty phase of a capital case was error that required new sentencing. *See Tennessee v. Harrington*, 627 S.W.2d 345 (Tenn.1981), *cert. denied*, 457 U.S. 1110, 102 S.Ct. 2913, 73 L.Ed.2d 1320 (1982).

■ The jury which sentenced the petitioner had a duty to apply the law of the State of Georgia as given by the trial judge, not its own interpretation of the law or its own interpretation of precepts of the Bible, in determining whether the petitioner should live or die. Yet the court permitted the jury to deliberate with the aid of a specific, extra-judicial code of conduct—a code which mandates death for numerous offenses, including filial disobedience and breaking the Sabbath (as well, of course, as containing enjoiners of mercy and forgiveness elsewhere). *See, e.g.,* Deut. 21:18–21; Exod. 31:14–15. To the average juror, Webster's Dictionary may be no more than a reference book, and The Reader's Digest nothing more than a diverting periodical; but the Bible is an authoritative religious document and is different not just in degree, although this difference is pronounced, but in kind. When, as here, a Bible was present in the jury room with the explicit unqualified approval of the court, it has great potential to influence the jury's deliberations.

The record indicates that the jury took a Bible into the jury room at the very start of deliberations in the sentencing phase of petitioner's trial. The record clearly indicates the members of the jury intended to use the Bible in some way or for some purposes. How the jurors used the Bible, whether as a silent monitor witnessing that the jurors approached their solemn task in the proper attitude, or for guidance as to their specific task, the Court cannot ascertain. A search for the command of extrajudicial "law" from any source other than the trial judge, no matter how well intentioned, is not permitted. The use by deliberating jurors of an extrajudicial code (not already embodied in their own characters) cannot be reconciled with the Eighth Amendment's requirement that any decision to impose death must be the result of discretion which is carefully and narrowly channelled and circumscribed by the secular law of the jurisdiction. As the United States Supreme Court stated in *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980) (citations omitted):

> If a State wishes to authorize capital punishment, it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.... It must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance, 'and that make rationally reviewable the process for imposing a sentence of death.'

As the Supreme Court further stated: "A capital sentencing scheme must, in short, provide a 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many in which it is not.'" 446 U.S. at 427, 100 S.Ct. at 1764 (citations omitted).

Georgia's death penalty statute lays out specific guidelines for separating "the many" from "the few." *See* O.C.G.A. § 17–10–30(b), formerly Ga.Code Sec. 27–2534.1(b). The Bible, however, in some

places explicitly rejects the drawing of distinctions in murder cases: "Whoso sheddeth man's blood, by man shall his blood be shed: for in the image of God made he man." Holy Bible, King James Version, Genesis 9:6. *See also* Holy Bible, King James Version, Leviticus 24:17 ("And he that killeth any man shall surely be put to death"). Whereas the Bible commands that "thine eye shall not pity; but life shall go for life, eye for eye, tooth for tooth, hand for hand, foot for foot," Holy Bible, King James Version, Deuteronomy 19:21, it is the law in this Circuit that arguments which disparage mercy as a valid sentencing consideration "strike at the most important component of a capital jury's discretion favoring capital defendants." *Wilson v. Kemp,* 777 F.2d 621, 626 (11th Cir.1985), *reh'g and reh'g en banc denied,* 784 F.2d 404 (11th Cir.1986), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986). *See also, Potts v. Zant,* 734 F.2d 526 (11th Cir.1984), *r'hg and r'hg en banc denied,* 764 F.2d 1369 (11th Cir.1985), *cert. denied,* 475 U.S. 1068, 106 S.Ct. 1386, 89 L.Ed.2d 610 (1986). Especially when, as here, such arguments come from a source which "would likely carry weight with laymen and influence their decision," *Wilson v. Kemp,* 777 F.2d at 626, the effect may be highly prejudicial to the defendant, and the confidence in the reliability of the jury's decision which must guide imposition of the death penalty may be undermined. *See Brooks v. Kemp, supra; Potts, supra.*

A situation in which a jury, unsupervised by the court and unobserved by counsel, could reach a conclusion by consulting sources other than the legal charge of the court and evidence actually received by the court is not permitted. "The Sixth Amendment guarantees that the accused shall enjoy the right to a trial by an impartial jury and shall be confronted with the witnesses and evidence against him.... The most general interpretation of a fair trial is that it be conducted before unprejudiced jurors under the superintendence of a judge who instructs them as to the law and advises

them as to the facts. Judicial control of the juror's knowledge of the case pursuant to the laws of evidence is fundamental to the prevention of bias and prejudice." *Farese v. U.S.,* 428 F.2d 178, 179–80 (5th Cir.1970). Extraneous materials, whether they be dictionaries, law books, or Bibles, unless properly received in evidence, are not allowed in the jury room for use by a deliberating jury. The jury should have with it in the jury room *only* those documents received in evidence, or perhaps judicially noticed and a copy of the court's charge if reduced to writing—nothing else.

The court in no way means to suggest that jurors cannot rely on their personal faith and deeply-held beliefs when facing the awesome decision of whether to impose the sentence of death on a fellow citizen. There is thus no issue raised here as to possession, even in the jury room, of personal Bibles, perhaps even consulted for personal—not group—inspiration or spiritual guidance. Likewise there is no issue raised here involving the (anti) Establishment clause,[18] such as is involved in the school prayer cases. The sole issue here involves the at least implied court approval of group jury reference to an extra-judicial authority—here the Christian Bible—for guidance in deciding the explicit, statutorily mandated, carefully worded guidelines which must be followed by a jury deliberating during the sentencing phase of a death penalty case.

In sum, it was constitutional error for the court to permit the Christian Bible to go into the jury room at the request of the jurors apparently for consultation in connection with their deliberations.

**B.** *Trial Court's Failure to Guide Discretion of Jury*

In Section J of his petition, the petitioner alleges that the trial court failed to guide properly the discretion of the jury when it gave its instructions on aggravating circumstances. The petitioner challenges the trial court's instructions with respect to

---

**18.** The First Amendment to the United States Constitution states in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

both of the aggravating circumstances found by the jury to be present in this case. The court will address each of the petitioner's arguments in turn.

*(1) Murder Committed During Commission of A Felony*

 The trial judge instructed the jury that if it found either of two aggravating circumstances to be present in this case, the jury could impose the sentence of death on the petitioner. The first aggravating circumstance that the judge asked the jury to consider was whether the offense of murder was committed while the defendant was engaged in the commission of another felony; to wit, armed robbery. The trial judge never instructed the jury on what are the elements of armed robbery. The petitioner argues that the court erred by failing to define in its charge the elements of armed robbery.

O.C.G.A. § 16–8–41(a) defines armed robbery:

A person commits the offense of armed robbery when, with intent to commit theft, he takes property of another from the person or the immediate presence of another by use of an offensive weapon, or any replica, article, or device having the appearance of such weapon.

The term "robbery" is a legal one. In *Rivers v. State*, 250 Ga. 303, 310, 298 S.E. 2d 1, 8 (1982), the Georgia Supreme Court held that " 'Burglary,' as it is defined in [the Georgia Code] is a legal word of art, and whether or not all of its elements have been proven beyond a reasonable doubt *cannot* be rationally determined by an uninstructed jury" (emphasis added). For the same reason, the *Rivers* court held that as "[a]rmed robbery ... was never defined ... [t]he jury's finding that the murder ... was committed during an armed robbery must be set aside." *Id. Accord, Burger v. State*, 245 Ga. 458, 461, 265 S.E.2d 796, 799, *cert. denied*, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 847 (1980).

The court agrees that the trial court erred by failing to define the elements of armed robbery. The court further finds that the error was not harmless. On the facts of this case, a reasonable juror could have believed that the petitioner was, in fact, at the store "burglarizing." (T. 844) A reasonable juror could have believed that although the petitioner intended to take property from the store, he did not intend to take property from Mr. Tackett.[19] This critical distinction between robbery and burglary was blurred by the court's failure to instruct the jury on the elements of armed robbery.

As the United States Supreme Court stated in *Maynard v. Cartwright*, —— U.S. ——, ——, 108 S.Ct. 1853, 1859, 100 L.Ed.2d 372, 380 (1988):

Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

The court finds that the trial court's failure to instruct the jury on the elements of armed robbery permitted the jury to exercise the kind of "open-ended discretion" invalidated in *Maynard* and *Furman*. The Supreme Court has stressed that "[w]hen a defendant's life is at stake, [courts must be] particularly sensitive to insure that every safeguard is observed." *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976) (plurality opinion). This court finds that the standard enunciated in *Gregg* was not complied with when the judge failed to instruct the jury on an essential element of a crime necessary to support a death sentence for that

---

**19.** O.C.G.A. § 16–7–1(a) defines burglary:

A person commits the offense of burglary when, without authority and with the intent to commit a felony or theft therein, he enters or remains within the dwelling house of another or any building, vehicle, railroad car, watercraft, or other such structure designed for use as the dwelling of another or enters or remains within any other building, railroad car, aircraft, or any room or any part thereof.

offense. *See United States v. Herzog*, 632 F.2d 469, 472 (5th Cir.1980) ("A trial court has the obligation to instruct the jury on *all* the essential elements of the crime charged, even though the defendant fails to request such an instruction") (emphasis in original); *see also Patrick v. State*, 247 Ga. 168, 170, 274 S.E.2d 570, 573 (1981), *cert. denied*, 459 U.S. 1089, 103 S.Ct. 575, 74 L.Ed.2d 936 (1982) (Georgia Supreme Court invalidates death sentence based on jury's finding of another capital felony, to wit: a kidnapping, on ground that judge charged only on "simple kidnapping" which is not a capital felony).

(2) *Aggravating Circumstance Under § (b)(7)*

Ga.Code Ann. § 27–3534.1(b)(7) permits the jury to impose the death penalty if it finds that "the offense of murder was outrageously and wantonly vile, horrible and inhuman in that it involved torture, depravity of mind, and an aggravated battery to the victim." Petitioner claims that the trial court erred by merely reading the language of this aggravating circumstance to the jury without explaining the meaning of the terms "torture", "depravity of mind", and "aggravated battery".

The Georgia Supreme Court has indicated that a trial court, when reciting the elements of the § (b)(7) aggravating circumstance, must define the term "aggravated battery". *Gilreath v. State*, 247 Ga. 814, 836, 279 S.E.2d 650, 670 (1981). O.C.G.A. § 16–5–24(a) defines aggravated battery: "A person commits the offense of aggravated battery when he maliciously causes bodily harm to another by depriving him of a member of his body, by rendering a member of his body useless, or by seriously disfiguring his body or a member thereof."

The United States Supreme Court has stated that under § (b)(7), "the word 'torture' must be construed *in pari materia* with 'aggravated battery' so as to require evidence of serious physical abuse of the victim before death." *Godfrey v. Georgia*, 446 U.S. 420, 431, 100 S.Ct. 1759, 1766, 64 L.Ed.2d 398 (1980). The trial judge did not define "aggravated battery", nor did he make it clear to the jury that they had to find evidence of serious physical abuse of the victim before death.

This court, after a review of the evidence, finds that a reasonable juror, if properly instructed, could very well have concluded that there was no aggravated battery in this case. There is no evidence that Mr. Tackett was beaten before he died. There was no disfigurement. The facts indicate that he was shot to death rather quickly. (Officer Kindel testified: "I heard four shots; three successive pops, a pause, and then a pop. Three real fast, a short pause and then another pop"). (T. 443). As the Georgia Supreme Court stated in *Hance v. State*, 245 Ga. 856, 268 S.E.2d 339 (1980), *cert. denied*, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 611 (1981): "The death of a victim who dies instantaneously with little or no forewarning does not involve torture or aggravated battery." 245 Ga. at 861–62, 268 S.E.2d 339.

As the trial court failed to guide the jury's discretion by explaining the legal terms on which the jury was to rely in imposing the sentence of death, this court finds that the sentencing determination made in petitioner's case falls below the minimum standards required by *Maynard* and *Godfrey*.

In sum, the court finds that the trial court's failure to instruct the jury as to crucial elements of the aggravating circumstances which the jury found to be present, resulted in a sentence, which if not invalidated, would violate the petitioner's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

C. *Petitioner's Additional Claims*

██ As stated above, the court shall briefly examine the petitioner's additional arguments with respect to the sentencing phase of his trial. The court will succinctly describe each of the petitioner's claims and tersely state why each is meritless.

(1) *Admission of Portions of Petitioner's Suppressed Statement*

In Section I of his petition, petitioner claims that his due process rights were

violated at the mitigation hearing because the prosecutor referred to statements made by petitioner in a post-arrest statement which the trial court suppressed following a pre-trial suppression hearing. The trial court never made an explicit ruling as to the voluntariness of the post-arrest statement, and petitioner alleges that use of this statement prior to an affirmative ruling by the court as to its voluntariness violated petitioner's due process rights. The specific statement to which petitioner objects is the prosecutor's insinuation that petitioner had stated at the time of arrest that he was "in there robbing the place." (T. 838). The prosecutor was attempting to elicit factual support for his reliance on the aggravating circumstance of murder committed during an armed robbery.

The petitioner's lawyer objected to use of the word "robbing", and the trial court, after a review of a transcript of the post-arrest statement, agreed that the petitioner had made no reference to "robbing the Tenneco," but had referred to "burglarizing the Tenneco." The trial judge then instructed the jury that: "there is no statement of the defendant to any police officer that he intended to rob Roger Tackett. So you are instructed to disregard the District Attorney's question to the defendant in this regard. Now, this is not an instruction that you cannot find that that was a purpose of the defendant, should you believe the evidence would support that finding beyond a reasonable doubt." (T. 874).

This court finds that any error in admitting portions of petitioner's post-arrest statement absent a specific finding regarding voluntariness was harmless in light of the court's curative instruction regarding the allegedly damaging portion of that statement.

(2) *Vague and Overbroad Application of Aggravating Circumstances*

■ In Section K of his petition, petitioner claims that to characterize the facts of petitioner's case as satisfying § 27–2543.1(b)(7) renders the construction of that statute so broad and vague as to apply to virtually any murder. The court finds this argument meritless in light of

the heinous facts of this case. The execution-style murder of an unarmed and already wounded innocent man provides an adequate factual basis for a jury's finding an aggravating circumstance under (b)(7). The petitioner's complaint that the jury made no specific factual findings applying (b)(7) to the facts of this case is without merit. There is no requirement under state law that the jury make a specific finding as to how the facts support (b)(7). Rather, it is only required that the form of the verdict set forth the applicable statutory language. *See Housel v. State*, 257 Ga. 115, 122, n. 4, 355 S.E.2d 651 (1987). That requirement was met here. (T. 881).

(3) *Failure to Record Bench Conferences*

■ In Section L of his petition, petitioner claims that the court's failure to allow transcriptions of bench conferences violated his constitutional rights under the Sixth and Fourteenth Amendments to the United States Constitution. Absent a showing of harm, the failure to transcribe such things as argument does not amount to a constitutional violation sufficient to require vacating a death sentence. *Dobbs v. Kemp*, 790 F.2d 1499, 1514 (11th Cir. 1986). The petitioner has shown no harm here. Accordingly, his argument regarding failure to record bench conferences is without merit.

(4) *Mistrial Motion During Sentencing Hearing*

In section N of his petition, petitioner claims that his constitutional rights were violated when the trial court overruled his motion for mistrial during the sentencing hearing after the prosecutor questioned petitioner about his post-arrest statement. For the reasons stated in Part IV, C(1) of this Opinion and Order, the court finds this claim to be without merit.

(5) *Discriminatory Aspects of Death Penalty in Georgia*

■ In section T of his petition, petitioner alleges that his death is being exacted pursuant to a pattern and practice of Georgia prosecuting authorities, courts, ju-

ries and governors to discriminate on the grounds of race, sex, and poverty in the administration of capital punishment. This claim was determined adversely to the petitioner in *McCleskey v. Kemp,* 753 F.2d 877 (11th Cir.1985) (en banc), *aff'd,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

Petitioner having presented no evidentiary support for this claim and in light of the rejection of this argument in *McCleskey,* the court finds this contention by petitioner to be without merit.

(6) *Insufficiency of the Evidence*

In section U of his petition, petitioner alleges that there was an absence of sufficient evidence upon which a rational trier of fact could conclude beyond a reasonable doubt that the murder was "outrageously or wantonly vile, horrible or inhuman." This contention is without merit. *See supra* Part II (Statement of Facts) of this Opinion and Order; *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

(7) *Denial of Medical Care*

In Section V of his petition, petitioner alleges that at the time of trial, he suffered from undiagnosed and untreated illnesses and was denied proper medical treatment by the state so as to impair his ability to assist his attorney. This contention is without any factual support in the record and is meritless.

(8) *Arbitrariness of Petitioner's Sentence*

In Ground W of his petition, petitioner alleges that he was sentenced to death and his death sentence was upheld on review by the Georgia Supreme Court in an arbitrary and capricious application of the death penalty which resulted in a disproportionate sentence. The court finds this argument to be meritless.

(9) *Means of Execution in Georgia*

In Ground X of his petition, petitioner claims that the means by which the death sentence will be administered will inflict wanton and unnecessary torture and torment upon him so as to violate his rights under the Eighth and Fourteenth Amendments. This claim has been raised and rejected on numerous occasions. *See, e.g., Funchess v. Wainwright,* 788 F.2d 1443 (11th Cir.1986). This contention by petitioner is without merit.

(10) *Use of Prior Illinois Robbery Conviction*

In Ground Y of his petition (see Petitioner's First Amendment to his Petition for a Writ of Habeas Corpus), petitioner claims that the use of a prior conviction at sentencing violated petitioner's constitutional rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. The state habeas court noted that at the hearing before that court, the record was left open for thirty days to allow petitioner to obtain a transcript of his prior conviction from Illinois, but the record was closed without the petitioner's having obtained a transcript. (Respondent's Exhibit No. 17, at 23).

The court finds this issue to be without merit as no evidence has been offered in support of the contention even though petitioner was accorded a full and fair opportunity to present evidence regarding this matter to the state habeas court.

(11) *Procedural Default of Grounds O, P, Q, R and S*

The claims raised in sections O, P, Q, R, and S of the petition were all presented to the Superior Court of Butts County in petitioner's successive state habeas petition. *See* Respondent's Exhibit Nos. 28–33. The Superior Court found these claims to have been procedurally defaulted under O.C.G.A. § 9–14–51.[20] (Respondent's Exhibit No. 31). In accordance with the Eleventh Circuit's ruling in *Presnell v. Kemp,* 835 F.2d

---

**20.** O.C.G.A. § 9–14–51 states:

All grounds for relief claimed by a petitioner for a writ of habeas corpus shall be raised by a petitioner in his original or amended petition. Any grounds not so raised are waived unless the Constitution of the United States or of this state otherwise requires or unless any judge to whom the petition is assigned, on considering a subsequent petition, finds grounds for relief asserted therein which could not reasonably have been raised in the original or amended petition.

1567 (11th Cir.1988),[21] this court defers to the state habeas court's finding of default and, absent a showing of cause and prejudice by petitioner, refuses to consider these claims on their merits.

The specific claims that this court determines have been procedurally defaulted are:

(1) the trial court's alleged failure to permit redress of a violation of petitioner's rights reducing the reliability in sentencing (paragraphs 71-75 of this petition, paragraph A (2a–e) of the successive state habeas petition)[22];

(2) that petitioner was denied his right to rebut the arguments against him and to a reliable sentencing determination made by a competent sentencer when the trial court refused a requested instruction concerning parole (paragraphs 76–85 of this petition, ground B, paragraphs 2f–2o of successive petition);

(3) that the prosecutor's closing argument fatally reduced the jury's sense of responsibility (paragraph 86 of this petition, ground C, paragraph 2q of successive petition);

(4) that there was prosecutorial misconduct during the sentencing phase (paragraphs 87–91 of this application, ground D, paragraphs 2r–2v of successive petition);

(5) that there was no finding that the petitioner killed or intended to kill and thus no basis for the imposition of the death penalty (paragraph 92; ground E of successive petition).

IN SUM, as to Grounds J and M, the Court GRANTS the petitioner's application for habeas corpus unless the State of Georgia shall have resentenced the petitioner within 120 days of the date this order is filed.

SO ORDERED.

---

**21.** The Eleventh Circuit held in *Presnell:*

[W]hen a petitioner presents a claim that the state collateral attack court refused to hear because it was contained in a successive petition, the petitioner must demonstrate cause for his failure to raise his claim in his earlier collateral proceeding and actual prejudice.

## APPENDIX A

With respect to the first juror called, Charlotte Holt, the trial court allowed defense counsel to ask thirty-four questions. Only one of these questions was disallowed by the trial court, i.e., the question of whether the juror had any feelings or impressions about this case at this point based on the preliminary charge and the questions already asked by defense counsel. (T. 17–18). The court held that this question was "too general," as the court stated that it was going to instruct the jury that they should be governed only by the evidence produced in the trial of the case. (T. 18). (T. 13).

Additionally, Mr. Green was allowed to ask concerning Ms. Holt's profession, her religious affiliation, whether she was active in church or civic clubs, (T. 13), questions concerning her children (T. 14), whether she had any relatives involved in law enforcement (T. 14), whether she read the newspaper and how regularly (T. 15), whether she had ready any articles in the paper relating to this case and whether she was familiar with the Delk Road area of Cobb County. (T. 15). Ms. Holt was also asked if she was familiar with hand guns (T. 16), whether she would give more credence to police officers or experts than regular witnesses (T. 16), whether she was aware that the state was asking for the death penalty, whether she had feelings about the death penalty (T. 16–17), whether she understood the necessity for unanimous verdicts (T. 17), and whether there was anything that Ms. Holt felt that she should tell defense counsel if she was selected to serve at this point in time. (T. 18).

With respect to the second prospective juror, Johnny Roper, defense counsel asked forty-four questions, none of which were disallowed by the trial court. In addition to the type of questions Mr. Green had

*Id.* at 1580.

**22.** The petitioner's successive state habeas petition is filed as Respondent's Exhibit No. 28 in this court.

asked Ms. Holt, Petitioner's trial attorney asked Mr. Roper if he regularly read magazines that were delivered to his home and what type of magazines. (T. 23). Again, Mr. Roper was asked whether he had heard or read anything about this case (T. 23), whether he was familiar with hand guns and specifically, whether he owned the guns and fired them occasionally and the reason why he owned a gun. (T. 24). Mr. Green asked prospective juror Roper, "Do any particular kind of cases come to mind when you think about the death penalty?" (T. 25).

The next, prospective juror, Frances Blair, was asked thirty-six questions by defense counsel. (T. 29–33). She was asked whether she held offices at church (T. 30), what news she normally watched on television (t. 31), whether she would have any trouble in letting her convictions be known as to how she felt about a verdict or about a situation in general (T. 33), whether she was familiar with guns and whether she kept the gun at her place of business. (T. 33–34).

Prospective juror Fielder was asked fifty-two questions by defense counsel (T. 36–43), and was only required to rephrase one question by the trial court. (T. 41–42). Mr. Fielder was asked whether he had ever served on a criminal jury before (T. 36), in what part of the county he lived (T. 37), what publications he received (T. 38), and whether he had read anything about the case (T. 39). Mr. Fielder's answers were direct and frank in responding to Mr. Green's question, although he was not sequestered from the other members of his panel: For example, when asked whether he had read anything about the case, Mr. Fielder replied, "I guess what comes to mind right now would be the police account of what transpired." (T. 39). Mr. Fielder was asked whether he had formed any opinion as a result of what he had read and he replied, "No." Mr. Fielder was asked about the death penalty and how he felt about it and he stated, "I believe in it." (T. 40–41). Mr. Green asked what Mr. Fielder thought about the death penalty and he stated, "I believe it is good punishment." (T. 41). Mr. Green questioned Mr. Fielder

about whether he believed there to be a Biblical foundation for the death penalty and whether he understood that the death penalty is not always given in murder cases. (T. 41). Mr. Green asked Mr. Fielder whether any particular kind of crime came to his mind when he thought about death penalty cases and Mr. Fielder replied, "Well, I guess I think about some of those mass murders, the Alday family in particular." (T. 43). Mr. Fielder's response to Mr. Green's question are indicative of the candor with which prospective jurors, even in the presence of the other panel members, responded to Mr. Green's questions.

Prospective juror Doris Slaton was asked forty-six questions by defense counsel. When asked whether she had read anything about this particular incident, Ms. Slaton replied, "I remember reading it when it happened, but I don't remember anything about it." (T. 47–48). Ms. Slaton was asked whether she had any trouble with the death penalty (T. 49), and was asked whether she believed in the death penalty. (*Id.*) There were no restrictions placed on defense counsel in questioning this prospective juror.

Prospective juror Bart Butler was asked thirty-nine questions by the defense counsel. (T. 52–57). When asked why he believed in the death penalty, Mr. Butler replied, "I believe it is a deterrent for crime." (T. 56). Mr. Butler was also asked how he felt about life imprisonment. *Id.*

Prospective juror Dennis Merton was asked thirty-eight questions by defense counsel, with no restrictions on the scope of the questions. (T. 59–62). Mr. Merton testified that he had not read anything about the case and that he had not heard of the case before it came up today. (T. 60–61).

Prospective juror Charles Williamson was asked forty-six questions by defense counsel with no restrictions. (T. 64–71). Mr. Williamson was asked whether he had ever sat on a jury before (T. 64) and replied that he had sat on a court-martial. (T. 64). Defense counsel also asked Mr. Williamson how long he had lived in Cobb County. (T.

65). Mr. Williamson admitted that he "might give more credence to an official" because of his training than a regular witness. (T. 68). Mr. Williamson also stated that he read newspapers "quite frequently." (T. 68). Mr. Williamson stated that he had not read or heard anything about this case and that he had not heard any discussions about it. (T. 69). In fact, Mr. Williamson stated, "This is the first time I learned about it, right here in this courtroom." (T. 269). Mr. Williamson stated that he believed in the death penalty, but "evidence has to be in my mind, no shadow of a doubt, no circumstantial evidence." (T. 69). Mr. Williamson was also asked about his children. (T. 71).

Prospective juror Robert Younglove was asked forty-four questions by defense counsel. (T. 73–78). Mr. Younglove testified that he did not remember reading anything about the case and that he had not hear anything about the case until today. (T. 75).

Prospective juror Ida Wright was asked thirty-three questions by defense counsel. (T. 80–85). Ms. Wright testified that she did not remember reading anything about this case in the newspapers, if she did read it. (T. 82).

Prospective juror Billy Savage was asked forty-nine questions by defense counsel. (T. 86–92). Mr. Savage was candid in stating that he remembered seeing something about the case in the paper when it first happened, but stated that he did not remember much about it. (T. 88). Mr. Savage candidly admitted, "Well, I believe probably everyone has an opinion after they read something." (T. 88). Mr. Savage admitted that he formed an opinion after he read it and that something should be done about it. (T. 88–89). Mr. Savage stated that what he meant by this was that something had to be done about the crime rate. (T. 89).

Prospective juror Walter Harris was asked fifty-nine questions by defense counsel. (T. 94–100). Mr. Harris testified that he did not remember reading anything about the case. (T. 96). Mr. Harris testified that, "I believe in the laws and the Bible." (T. 98). Mr. Harris also stated that he believed in the Old Testament and that he felt that people should not just serve a year or two on a life sentence. (T. 98). Mr. Harris was asked if there was any reason he did not want to serve on the jury, and he replied, "No, sir." (T. 100).

The next panel was asked general questions by both the state (T. 102–103) and defense counsel (T. 103–106). Then this first panel was excused. (T. 106–107). Panel two was then called. (T. 108).

Prospective juror William Armour was asked fifty-four questions. Mr. Armour testified that the only time he had heard about the case was in court. (T. 114).

Prospective juror Sarah Lawing was asked forty-five questions by defense counsel. (T. 119–125). Ms. Lawing admitted that she read something in the papers about the case within the previous two weeks, but the only thing that stood out in her mind was that they were asking for the death penalty. (T. 122). Ms. Lawing testified that she had not formed an opinion from anything that she had read.

Prospective juror Margaret Cable was asked forty-one questions by defense counsel. (T. 127–133). Ms. Cable testified that she did read something about this case in the paper, but right after it happened. (T. 129). Other than this information, Ms. Cable testified, "I don't recall too much. The man that was killed wasn't supposed to be there. I think his manager didn't show up and he had to go and was killed there." (T. 129). Ms. Cable testified that she though that the death penalty would prevent crime. (T. 130).

Prospective juror Stanley Marks was asked forty-seven questions by defense counsel. (T. 134–141). Mr. Marks testified that he did recall reading something about the case, "right after it happened," but stated, "I don't really remember a whole lot about it. I remember reading something about it." (T. 136). All that Mr. Marks remembered was [I] "just know that there was somebody killed at a store over there." (T. 136). Mr. Marks remembered that there were two people arrested, but stated, "I didn't form an opinion about it."

(T. 137). When asked whether Mr. Marks would be influenced by what he had read, he stated, "I believe somebody before I'd believe the paper. The paper tends to be— (sic)." (T. 140).

Prospective juror Earline McLain was asked forty-three questions by the defense counsel. (T. 142–148). This prospective juror testified that she heard about the incident when it first happened, but that she did not remember any of the "details." (T. 144).

Prospective juror Donald Hottle was asked forty questions by defense counsel. (T. 149–156). Mr. Hottle testified that he was sure that he had read something about the case but that he did not recall anything about what he had read. (T. 152).

Prospective juror Reynolds was asked thirty-eight questions by defense counsel. (T. 157–162). Mr. Reynolds stated that he never read anything about the crime. (T. 159).

Prospective juror Lena Stevens was asked forty-one questions by defense counsel. (T. 164–169). She testified that she had not read or heard anything about the case. (T. 166). The only restriction placed on defense counsel's questioning of this witness was when defense counsel attempted to ask Ms. Stevens how she would feel if she got beyond the guilt-innocence phase to the sentencing phase and the court instructed the defense counsel that this was an impossible question to answer because she had no evidence whatsoever to base her response upon. (T. 167–168). The court then questioned whether Ms. Stevens could be a fair and impartial sentencer and she replied that she could. (T. 168).

Prospective juror George Cox was asked forty-six questions by defense counsel. (T. 171–177). Mr. Cox testified that when the incident happened he heard that there had been a "hold-up" at a service station on Delk Road and a person was killed, but that was the only information he had. (T. 174). Mr. Cox testified that as a result of what he heard, he did not form any opinion as to the situation. (T. 174).

Prospective juror Edward Albrecht was asked forty-five questions by defense counsel. (T. 180–186). Mr. Albrecht testified that he did read the specific articles about the case and that the victim went to the same church as he did. (T. 182). Mr. Albrecht stated that he did not know the victim personally, but that this was someone that he saw periodically. (T. 183). However, Mr. Albrecht admitted that his wife and children knew the victim. (T. 183). However, Mr. Albrecht stated that they did not discuss the crime except to say that it was "a bad situation." (T. 183). This is illustrative of the type of candor that was elicited from prospective jurors by defense counsel.

Prospective juror Connie Meyer was asked thirty-eight questions by defense counsel. (T. 188–191). When the state challenged this juror, defense counsel was allowed to ask additional questions. (T. 191–193). Then additional questions were asked of Ms. Cable by the court and counsel for both sides. (T. 193–197).

Prospective juror Bobbie Hughie was asked forty-eight questions by defense counsel. (T. 199–205). When asked what she had heard about the case, Ms. Hughie replied, "Well, I heard a lot, I am sure I probably read about it the day it happened, but didn't even take it all in, you know, go into it." (T. 201). However, Ms. Hughie testified that she did not remember anything about the incident and that she had not heard anything since she read the initial report. (T. 201). Ms. Hughie testified that she "tried not to form opinions from what I read." (T. 202). When asked how she felt about life imprisonment as a punishment, however, Ms. Hughie candidly replied, "I think they get off on good behavior." (T. 203).

Then, general questions were asked of the panel. (T. 205–211).

With respect to panel number three, prospective juror Linda Nix was asked forty-three questions by defense counsel. (T. 213–219). Ms. Nix testified that she had not read anything about the incident, but that she did remember hearing on the radio that there had been a shooting at the gas station. (T. 215). However, Ms. Nix testi-

fied that she had not formed any sort of opinion about the case. (T. 215–216).

Prospective juror James Turnipseed was asked forty-seven questions by defense counsel. (T. 220–227). Mr. Turnipseed stated, "I can remember, frankly, I remember reading it when it first happened, original, didn't go into detail." (T. 224). Mr. Turnipseed testified that he thought it was a robbery or had occurred during the commission of a robbery. (T. 224). When asked whether he had formed any opinion as to this particular case, Mr. Turnipseed replied, "Well, I may have slightly, but not conclusively." (T. 224–225). Mr. Turnipseed stated, "Every time I read of a murder, a case of murder, I think of the criminals that are still loose because of the court that gave them life sentences and were paroled out in a short period of time." (T. 225).

Prospective juror Gladys Poole was asked thirty questions by defense counsel. (T. 228–232). Ms. Poole stated that she had not heard anything about the particular case until she came to court on the morning of trial, nor had she heard anything about the case before that day. (T. 230).

Prospective juror John Anderson was asked forty-four questions by defense counsel. (T. 234–240). Mr. Anderson stated that he had gone to school as a private detective and had worked at the Peachtree Plaza Hotel as a security supervisor. (T. 235). Mr. Anderson testified that he had not read anything about the case before he came to court that day. (T. 236).

Prospective juror Robert Stokes was asked forty-two questions by defense counsel. Mr. Stokes stated that he did not recall reading anything about this particular case. (T. 243).

Prospective juror Esther Renner was asked twenty-eight questions by defense counsel. Prospective juror Martha Adams was asked forty-eight questions by defense counsel. (T. 254–262).

Prospective juror Henry Garmon was asked twenty-eight questions by defense counsel. (T. 263–268). Garmon testified that he had not heard or read anything about this case. (T. 264).

Prospective juror Bobbie Barnett was asked thirty-four questions by defense counsel. (T. 269–274). She stated that she had not heard anything about this case until he came into the courtroom. (T. 270).

Prospective juror Arthur Martin was asked thirty-two questions by defense counsel. (T. 276–281). Prospective juror William Sweatt was asked thirty-five questions by defense counsel. (T. 281–287).

Prospective juror Robald King was asked twenty-eight questions by defense counsel. (T. 288–293). The trial court asked that defense counsel rephrase a question because the court stated that the question was "argumentative." (T. 290). General questions were then asked of panel three. (T. 293–299).

The first juror in panel number four, Margaret Darling, was asked thirty-six questions by defense counsel. (T. 301–308). When asked if she had heard anything about this particular case, Ms. Darling replied, "I feel that I must have, but I don't recall it." (T. 303).

Prospective juror Terry Lawrence was asked fifty-one questions by defense counsel. (T. 308–315). Mr. Lawrence testified that he had just read something about this case when it first happened. (T. 311). All that he recalled was that there had been an attempted robbery. *Id.*

Prospective juror James Malone was asked forty-one questions by defense counsel. (T. 316–321).

Prospective juror Laura Walker was asked thirty-five questions by defense counsel. (T. 322–328). Ms. Walker stated that it seemed like she had heard something about the crime but that she did not remember reading it. (T. 324).

Prospective juror Clarence Nash was asked twenty-four questions by defense counsel. (T. 329–333).

Prospective juror William Morrow was asked thirty-two questions by defense counsel. (T. 335–341). All that he recalled hearing or reading about this incident was that there was a robbery and murder which had taken place. (T. 337). General ques-

tions were then asked of this panel. (T. 341–344).

## APPENDIX B

MR. CHARRON: The State of Georgia will call at this time Mr. Alex Woolard to the stand.

The said witness, ALEX WOOLARD, a witness called on behalf of the State, after having first been duly sworn, testified as follows:

## DIRECT EXAMINATION

BY MR. CHARRON:

Q Please state your full name, sir, and how you are employed?

A Alex Woolard with Security Consultant, Private Investigator.

Q Would you please tell us how long you have been a private investigator, Mr. Woolard?

A Ten years.

Q Prior to being in the private investigation field, what type of employment were you in?

A Law enforcement.

Q Who did you work for then?

A Several sheriff's departments and the State and Florida and Governor's Office, Beverage Department.

Q How long in all have you been in law enforcement?

A 23 years.

Q What type of training have you received as a result of your police law enforcement?

A From arson, homicide, organized crime, intelligence, I think I have got about 800 hours classroom.

Q Mr. Woolard, were you working in your security department—in your work capacity on the 17th day of June, 1979?

A Yes, sir.

Q Drawing your attention to the early morning hours of the 17th, would you please tell us where you were that night?

A Terrell Mill and 41.

Q What were you doing at that time?

A I was making a lighting survey for a client, north by northwest.

Q And what did you do or hear, if anything, at the time you were out Terrell Mill Road?

A I heard Officer Kindel state over my monitor that—

MR. GREENE: Your Honor, I object to him testifying what he heard someone say. It would be hearsay.

Q Can you identify who that was that you heard on the air?

A Yes.

Q Have you heard Officer Kindel's voice before?

A Going on several years; yes, sir.

Q All right. Go ahead.

THE COURT: What is your objection, now?

MR. GREENE: Hearsay.

THE COURT: On what basis?

MR. GREENE: As I understand his testimony, he is hearing it over the radio.

THE COURT: Are you offering it for the purpose of explanation?

MR. CHARRON: For the purpose is, as a result of that, what Mr. Alex Woolard did.

THE COURT: Well, don't go into what was said, just say in response to what you heard what you did do.

Q Go ahead, Alex. As a result of that dispatch, tell us what you did?

A I proceeded to the Tenneco station on Bentley Road and Delk.

Q What did you see and do when you arrived there?

A As I pulled in the driveway, Officer Kindel was walking out the front door with one black male handcuffed behind with his gun behind his head.

Q And what did you do?

A As soon as I pulled in, Officer Kindel asked me if I had an extra set of handcuffs and I said yes, and I got out of the car. He had one black male already in the back of the car with the door shut that was not handcuffed and I handed him my handcuffs

over the top of his patrol car. He placed the subject on—in the front of the car, the middle, with his hands behind him, handcuffed, and I walked around and covered him while he opened the back door, pulled the other subject out, handcuffed him and put him back in the car.

Q Could you later identify who the subject was that you were covering on the front hood of the car?

A Yes, sir.

Q Who was that?

A I later found out his name was—one of his names was May.

Q Is that the subject that you covered?

A Yes.

Q Do you see here in the courtroom?

A Yes, sir.

Q Would you please point him out?

A (Indicating).

MR. CHARRON: Let the record reflect that he has identified the Defendant in this case.

Q Now, after Solomon was handcuffed by Officer Kindel, what did you do?

A We put the subject in the back of the car, closed the door, which had a cage in it. I watched this subject and Officer Kindel went in the store and looked around. There was a green Chrysler product, I believe it was a Dodge, four-door, parked in front, parallel to the curb, right at the door, with the driver's door open. When Kindel walked out, I asked him whose car it was and he said, "It is theirs." Well, it didn't look like their car, a car they would drive. So, I asked him to watch him while I looked at the car. I went and looked at the car and I came back and I said, "No, that isn't their car." So, I asked the subject, May, if this was their car and he said no. About that time, Kindel spotted a van hidden down in the woods by the Tenneco station. We could just see the—I could just see the corner of it.

Q Approximately how far would you say that was from the Tenneco store?

A About 50 yards.

Q Go ahead.

A 45 or 50 yards. At which time, Kindel went and looked at it, and it had some burglary tools in it, later identified as burglar tools. He came back and told me that.

MR. GREENE: I object to that as being totally hearsay in the rancious form.

THE COURT: Well, the jury will not regard it as establishing the truth of the report, but as explaining the conduct of this witness or the other witness, if it gives it any explanation.

Q Go ahead and continue. What did you do after Officer Kindel returned from the van?

A Officer Kindel returned to the van and I said, "Kindel, there is something wrong. You had better go back in the store and look around." The stores have a padlock at the top of them and this door was standing open. I said, "Where is the padlock to the door?" I asked the subject, the defendant, and he said there wasn't any padlock. I asked him how he got in the store and he said it was open. I asked him again and he said he had a key that would open any door. And I said, "I want to see that tool."

So, I asked him what he had done with it and he said he had thrown it out in the road. Well, he had a cap on and I took the cap off and looked through the cap and there wasn't anything. I thought he might have had a key hidden. And I took his shoes off and looked at them and there wasn't anything. I asked him, "Have you ever worked for the Tenneco stores?" And he said, "No." I asked him what they h–d—what they were doing there and he said, "We came to burglarize the place." Kindel came back out again and I told him, "There is something wrong here. We have too many cars." And, "There is somebody back there somewhere around this building." I said, "There has got to be another person."

So, I kept asking him—

Q Who are you referring to?

A The defendant.

I told him, I said, "You can't get in anymore trouble." I said, "Why don't you

tell me what is going on, the whole storey." And he said, "I might get in too much trouble." And he kept looking up—his face was down, this way, and he wo-ld look up through the windshield to the back where the other subject was sitting and then put his head back down again. He did this two or three times. When I asked them a question—it was approximately 30 minutes after I arrived on the scene—in talking to him, that he decided—he told me, he said, "Well, I might as well tell you—", he said, "—that there is a man in the back, hurt." And I·said, "What do you mean 'hurt'?" He said, "He is hurt bad, he is bad hurt," is what he said. I said, "Has he been beaten up or what?" He said, "No. He has been shot." And I hollered for Kindel that—he was in the store—and I told him, I said, "We have got a body in the back." I said, "Try to kick the door down." He said, "I have tried."

Q At the time that Mr. May had said to you that there was a body in the back, Officer Kindel was not within earshot, he was in the store, correct?

A Right; he was still trying to gain entrance into the back.

Q Okay. Go ahead.

A So, I told him to watch him and I went inside to kick the door down and I couldn't. So, I came back out and I told Kindel, I said, "I am going to get a pry bar out of the back of the car." About this time, a corporal pulled up with the county and I said, "Watch this fellow, I am going to get a crowbar out of my car so we can open the door. We have got a body." Kindel and I went in the store, pried the door open, and as the door swung into the left, it swung in quite a ways, I looked around the door and there was a subject lying on the floor in a pool of blood.

Q What did you do at that time?

A At that time Kindel—I said, "See if he has got a pulse." And he reached over and he didn't have any pulse, because the blood there was about—a pool of blood that had already started to coagulate, he had a bad hole back here where the blood was coming out, coming out the front, the pool kept getting bigger. I turned around and walked back outside to put the pry bar up and noticed on the left-hand side of the door there was a box with two guns in it and one was cocked. They were laying side-by-side. I went outside, put the pry bar in the car. About this time Lt. Brown pulled up. I walked back over to the subject, the Defendant, and asked him where the guns were and he said, "I will show you." I called down and told him, I said, "This fellow, here, will show you where the guns are." I turned him over to Lt. Brown.

Q All right.

A I went up and told Lt. Moss, when they were taking the photographs of the door, that they were my pry marks on the door, that we had to force entry into the room. And I walked back out and Lt. Brown had handcuffed the defendant to a pole in front of the patrol car, he was trying to talk to the subject in the back of the patrol car.

Q Who was trying to talk to him?

A The Defendant.

Q All right.

A I couldn't hear what was said, I was too far away at that time. I moved the patrol car back so they couldn't converse.

Q What did you do after that?

A After that, I observed him for a while and—until there was enough officers on the scene and then I told Lt. Moss I was leaving.

Q Did you then go back to your service?

A Yes, I went back and finished up my survey.