The STATE of Ohio, Appellee,

v.

WILLIAMS, Appellant.

[Cite as *State v. Williams,* 162 Ohio App.3d 55, 2005-Ohio-3366.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–04–1122.

Decided June 30, 2005.

See also, 99 Ohio St.3d 439, 793 N.E.2d 446.

**58**

Julia R. Bates, Lucas County Prosecuting Attorney, Timothy F. Braun, and Brenda J. Majdalani, Assistant Prosecuting Attorneys, for appellee.

David H. Bodiker, State Public Defender, William J. Mooney, and Richard J. Vickers, Assistant State Public Defenders, for appellant.

PIETRYKOWSKI, Judge.

{¶ 1} Defendant-appellant, Robert Williams, appeals the April 13, 2004 judgment of the Lucas County Court of Common Pleas, which, following an evidentiary hearing, denied appellant's motion for postconviction relief. For the reasons that follow, we affirm the trial court's judgment.

{¶ 2} The relevant facts that were adduced at the hearing are as follows. On March 2, 1999, appellant was indicted for the February 18, 1999 murder, rape, and robbery of 88–year–old Velma McDowell. The indictment contained death-penalty specifications. The trial began on August 9, 1999, and the jury returned a guilty verdict, as to all counts, on August 18, 1999.

{¶ 3} Following the mitigation phase of the trial, which began and ended on August 19, 1999, the jurors began their deliberations. After deliberating for approximately six to seven hours, the 12 regular jurors and four alternate jurors [1] were sequestered overnight at a nearby hotel. The jurors were accompanied by the court's criminal bailiff and two court deputy sheriffs.

{¶ 4} The next morning as the jurors, alternate jurors, and the court personnel were assembling to return to the courthouse, the jury foreperson approached an alternate juror and asked him if he would lead the jurors in prayer. The

---

1. The issue of the trial court's failure to dismiss the alternate jurors following the guilt phase of the trial is not before the court on appeal. See Crim.R. 24(F), amended *after* the trial in this matter.

alternate then asked the bailiff if the jurors were permitted to pray before returning to the courthouse. The bailiff responded that it "wasn't [her] decision to make" and that "it was something that would be up to [him] and the other jurors." The alternate then addressed the group and indicated that there had been a request for a prayer; he stated that if any of the jurors were uncomfortable, they did not need to participate. According to the testimony, all 16 jurors held hands while the alternate led the prayer. The prayer, as remembered by the alternate, was as follows: "Give us guidance in the decision we're about to make, and after that decision has been made, give us peace in our hearts with the decision that was made."

{¶ 5} During the prayer, the court bailiff stood behind the circle of jurors with her head bowed and her eyes closed. The foreperson testified that the prayer "gave us a sense of peace" and that "[w]e just kind of felt better after that, after him saying the prayer." Similarly, a second juror who testified at the hearing stated:

{¶ 6} "Q. Did the prayer help you with that decision?

{¶ 7} "A. Not with the decision. It helped—maybe it helped me be more comfortable with the decision. For me the decision had been made prior to this collective prayer.

{¶ 8} "Q. Did it solidify the decision for you?

{¶ 9} "A. No, I don't think it solidified it. I guess it made me just more comfortable with it or—not solidify. I wouldn't use that term.

{¶ 10} "Q. It brought you peace that morning, that prayer?

{¶ 11} "A. Yes."

{¶ 12} The jury returned to the courthouse and, after deliberating for about one hour, recommended the imposition of the death penalty. The court followed the jury's recommendation and imposed the death penalty. The bailiff testified that she did not discuss the prayer with the trial judge, and appellant's counsel did not learn of the prayer until several months following his sentencing.

{¶ 13} On December 6, 2000, appellant filed a petition for postconviction relief; appellant filed an amended petition on January 2, 2001. On March 28, 2001, the trial court denied appellant's petition without conducting a hearing. On appeal, this court ordered that a hearing be conducted because "the content and effect of th[e] prayer" were in dispute. See *State v. Williams*, 149 Ohio App.3d 434, 2002-Ohio-4831, 777 N.E.2d 892 ("*Williams I*") The postconviction hearing was held on March 29, 2004, and on April 13, 2004, appellant's petition was denied. This appeal followed.[2]

---

**2.** On August 27, 2003, the Supreme Court of Ohio affirmed appellant's conviction and death sentence. *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446.

{¶ 14} Appellant now raises the following four assignments of error:

{¶ 15} "Assignment of Error No. I

{¶ 16} "The trial court erred when it held that appellant had no standing to bring a claim of the violation of his rights as guaranteed by the First Amendment to the United States Constitution.

{¶ 17} "Assignment of Error No. II

{¶ 18} "The trial court erred when it held that the prayer session held by appellant's capital trial jurors did not violate the First Amendment to the United States Constitution.

{¶ 19} "Assignment of Error No. III

{¶ 20} "The trial court erred in finding that the prayer session did not violate appellant's Eighth Amendment right to a reliable verdict.

{¶ 21} "Assignment of Error No. IV

{¶ 22} "The trial court erred in ruling that appellant's right to due process of law was not violated by the prayer session."

■ {¶ 23} Postconviction relief is governed by R.C. 2953.21(A)(1).[3] To obtain post-conviction relief in the trial court, a petitioner bears the initial burden of presenting evidentiary documents containing sufficient operative facts to demonstrate a denial of a constitutional right and resulting prejudice. *State v. Jackson* (1980), 64 Ohio St.2d 107, 18 O.O.3d 348, 413 N.E.2d 819.

{¶ 24} The standard of review of a trial court's decision denying postconviction relief is a mixed question of law and fact; therefore, factual issues are reviewed under a manifest weight of the evidence standard, and legal issues are reviewed de novo. *State v. Hoffner*, 6th Dist. No. L–01–1281, 2002-Ohio-5201, 2002 WL 31162813, at ¶ 6.

■ {¶ 25} In his first assignment of error, appellant argues that the trial court erroneously held that appellant had no standing to assert a violation of rights claim under the First Amendment to the United States Constitution, particularly the portion known as the Establishment Clause, which provides:

---

3. {¶ a} R.C. 2953.21 provides:

{¶ b} "(A)(1) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or Constitution of the United States * * * may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief."

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

{¶ 26} Appellant acknowledges that in *Williams I*, this court determined that even assuming that appellant's argument that the bailiff "participated" in the prayer was true, appellant, a criminal defendant, did not have standing to assert a First Amendment claim in an attempt to vitiate his sentence. Accordingly, pursuant to the "law of the case" doctrine, we agree with the state that the trial court was bound to follow this court's ruling on the same factual and legal issues. See *Judy v. Bur. of Motor Vehicles*, 6th Dist. No. L–01–1200, 2004-Ohio-5673, 2004 WL 2384371, at ¶ 13, citing *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, 4, 11 OBR 1, 462 N.E.2d 410.

{¶ 27} Appellant now argues that *Williams I* was wrongly decided and that all individuals, including criminal defendants, are entitled to the same First Amendment protections. We are compelled to respond to appellant's arguments.

{¶ 28} At the outset, we agree with appellant's basic assertion that the First Amendment, applied to the states through the Fourteenth Amendment, applies to all individuals. However, our analysis does not end here. Historically:

{¶ 29} "[T]he First Amendment was added to the Constitution to stand as a guarantee that neither the power nor the prestige of the Federal Government would be used to control, support or influence the kinds of prayer the American people can say—that the people's religions must not be subjected to the pressures of government for change each time a new political administration is elected to office." *Engel v. Vitale* (1962), 370 U.S. 421, 429–430, 82 S.Ct. 1261, 8 L.Ed.2d 601.

{¶ 30} In order to maintain a First Amendment claim, a party must first have standing.

{¶ 31} " 'The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." ' *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72 [98 S.Ct. 2620, 57 L.Ed.2d 595] (1978), quoting *Baker v. Carr*, 369 U.S. 186, 204 [82 S.Ct. 691, 7 L.Ed.2d 663] (1962). This requirement of a 'personal stake' must consist of 'a "distinct and palpable injury * * *" to the plaintiff,' *Duke Power Co., supra*, at 72 [98 S.Ct. 2620, 57 L.Ed.2d 595], quoting *Warth v. Seldin*, 422 U.S. 490, 501 [95 S.Ct. 2197, 45 L.Ed.2d 343] (1975), and 'a "fairly traceable" causal connection between the claimed injury and the challenged conduct,' *Duke Power Co., supra*, at 72 [98

S.Ct. 2620, 57 L.Ed.2d 595], quoting *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 261 [97 S.Ct. 555, 50 L.Ed.2d 450] (1977)." *Larson v. Valente* (1982), 456 U.S. 228, 238–239, 102 S.Ct. 1673, 72 L.Ed.2d 33.

{¶ 32} As we stated in *Williams I*, after a thorough review of federal and state case law, we can still find no cases where a criminal defendant successfully raised a First Amendment claim in order to vitiate his sentence. Further, as set forth above, in order to have standing to raise a First Amendment claim, a party must be able to demonstrate "a distinct and palpable injury" and a causal connection between the injury and the challenged conduct. Appellant contends that the fact that the jury recommended a death sentence establishes his "personal stake" in the controversy. However, appellant has presented no evidence that the prayer in any way influenced the juror's actions. Accordingly, we again find that appellant lacked standing to bring his First Amendment claim. Appellant's first assignment of error is not well taken.

{¶ 33} In his second assignment of error, appellant argues that the trial court improperly held that the prayer at issue did not violate his First Amendment rights. Though we need not address appellant's argument based upon our prior findings, we believe that even assuming that appellant did have standing to raise the First Amendment claim, it nevertheless would fail.

{¶ 34} It is apparent that appellant's right to "free exercise" of religion was not implicated; appellant failed to demonstrate how the jury prayer infringed upon his own religious beliefs. See *McGowan v. Maryland* (1961), 366 U.S. 420, 429–430, 81 S.Ct. 1101, 6 L.Ed.2d 393. Thus, the issue is whether the trial court, through its bailiff, improperly "endorsed" religion and thus violated the requirement of the separation of church and state.

{¶ 35} As set forth in the facts above, prior to their return to the courthouse to resume mitigation-phase deliberations, an alternate juror asked the court bailiff if the jurors could say a prayer. It is undisputed that the bailiff neither gave permission nor prohibited the prayer from taking place. The bailiff specifically stated that the decision to pray was solely up to the jurors. The alternate then gave the jurors an opportunity to abstain from the prayer although, according to the testimony, they all participated. Next, the alternate's prayer itself did not promote or encourage a particular verdict. In the court's findings of fact, the prayer is quoted as: " 'Give us guidance with the decision we have to make and give us peace in our hearts with whatever that decision is.' " The court then concluded that the prayer made no reference to a specific deity. The court also noted that there was no evidence that any alternate juror communicated with a regular juror with regard to any substantive trial matter or during jury room deliberations. Finally, as to the actions of the court personnel during the prayer,

the court found that no court personnel joined hands with the jurors and that the bailiff bowed her head out of respect.

{¶ 36} After careful review of the record in this case and the applicable law, we conclude that the prayer made by the alternate and the actions of the bailiff did not act to deny appellant of his First Amendment right to be free from state endorsement of religion. The prayer did not add any extrajudicial matter to the deliberations, it did not contradict the court's instructions, and no evidence was presented to show that it caused any juror to modify his or her views; and, according to the testimony presented at the hearing, the prayer was intended to bring the jurors peace with whatever decision that was made. Accordingly, we find appellant's second assignment of error not well taken.

{¶ 37} In appellant's third assignment of error, he contends that the court erroneously found that the prayer session did not violate his Eighth Amendment right to a reliable verdict. In support of his argument, appellant cites *Jones v. Kemp* (N.D.Ga.1989), 706 F.Supp. 1534. In *Jones,* the trial judge permitted the jurors to take the Christian Bible into the jury room. The court concluded that the presence of the Bible in the jury room had great potential to influence the jury's deliberations. Specifically, the court found:

{¶ 38} "A search for the command of extrajudicial 'law' from any source other than the trial judge, no matter how well intentioned, is not permitted. The use by deliberating jurors of an extrajudicial code (not already embodied in their own characters) cannot be reconciled with the Eighth Amendment's requirement that any decision to impose death must be the result of discretion which is carefully and narrowly channeled and circumscribed by the secular law of the jurisdiction." Id. at 1559.

{¶ 39} Interestingly, the *Jones* court further stated that "[t]he court in no way means to suggest that jurors cannot rely on their personal faith and deeply-held beliefs when facing the awesome decision of whether to impose the sentence of death on a fellow citizen." Id. at 1560.

{¶ 40} After a careful reading of *Jones,* it is apparent that it does not support appellant's argument. First, when the prayer was held, the jurors were not deliberating. Second, the prayer could not be considered an "extrajudicial code"; unlike certain tenets of the Bible, the prayer did not encourage or discourage a recommendation that the death penalty be imposed. Finally, the prayer was not inconsistent with the trial court's jury instructions. Based on the foregoing, including our analysis of appellant's first and second assignments of error, we find that the prayer was not in violation of appellant's Eighth Amendment right to a reliable verdict. Accordingly, appellant's third assignment of error is not well taken.

{¶ 41} In appellant's fourth and final assignment of error, he contends that his right to due process of law was violated by the prayer session. Appellant contends that the need to look to a higher power's message is outside the secular law and, thus, inconsistent with the Fourteenth Amendment's mandate that no person be deprived of his life without due process of law.

{¶ 42} Several courts have addressed the issue of jury prayer and have concluded that it did not prejudice the constitutional rights of the defendant. See *State v. Langley* (La.1998), 711 So.2d 651 (jurors opened deliberations with a prayer and collectively prayed each day before going to the courthouse); *New Jersey v. Scherzer* (1997), 301 N.J.Super. 363, 694 A.2d 196, 259 (the trial judge denied granting a mistrial because he found credible the jurors' statements that the prayers did not prejudice their ability to fairly decide the case); and *State v. DeMille* (Utah 1988), 756 P.2d 81, 84 (if the juror is capable of fairly weighing the evidence and applying the law, then the juror's decision may not be challenged on the basis that he or she may have reached it by the aid of prayer). Thus, the mere fact that a jury or jurors have participated in prayer does not, absent evidence that the prayer rendered the juror or jurors incapable of making an unbiased decision, substantiate a due process violation. Further, as set forth above, the facts of this case do not show that the actions of the court bailiff denied appellant any constitutional protections.

{¶ 43} Based on the foregoing, we find that the prayer session did not violate appellant's right to due process of law. Appellant's fourth assignment of error is not well taken.

{¶ 44} On consideration whereof, we find that substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal for which sum judgment is rendered against appellant on behalf of Lucas County and for which execution is awarded. See App.R. 24.

Judgment affirmed.

HANDWORK and PARISH, JJ., concur.